497 So.2d 460 (1986)
J.O. BANKS, et al.
v.
Paul W. BRYANT, Jr., et al.
84-959.
Supreme Court of Alabama.
September 19, 1986.
As Corrected on Denial of Rehearing November 7, 1986.
*461 Frank M. Bainbridge and Bruce F. Rogers of Porterfield, Scholl, Bainbridge, Mims & Harper, Birmingham, for appellants.
James J. Jenkins of Phelps, Owens, Jenkins, Gibson & Fowler, Tuscaloosa, for appellees.
PER CURIAM.
This case involves a dispute between the minority and majority stockholders of Greene Group, a corporate holding company that controls, among other things, the Greene County greyhound racing track known as "Greenetrack." The dispute arose over the manner in which the majority stockholders, who are also corporate officers-directors, obtained a contract to manage a newly formed greyhound racing track in Macon County for themselves as individuals rather than for the corporation they served.
The facts of the case are as follows: During the years that Greenetrack was the only operating greyhound racing track in the state besides the one in Mobile, one of the corporate policies of Greene Group was to actively resist all potential competition. An alternative plan was that if other tracks were authorized in the state, the corporation would exert maximum effort to contract for the construction and operation of such other tracks.
When legislation was passed allowing the construction of a dog track in Macon County, the three Greenetrack majority stockholders, who are the three Defendants here, acted on their own behalf, and not for the corporation, in obtaining a contract to operate the Macon County track. Plaintiffs allege that Defendants took for themselves a corporate opportunity that belonged to Greene Group when they obtained a contract to operate the Macon County track.
Defendants contend, and the trial court held, that no such corporate opportunity existed because, among other reasons, Milton McGregor, head of the group that eventually formed Macon County Greyhound Park, Inc., did not want Greene Group involved, either as a corporate entity or with the Plaintiffs as individuals, because of the bickering he knew to be going on among the group. McGregor had had prior business dealings with the three individual Defendants, and had requested that those three individuals alone take part in the management of the new track. Thus, the court found that this was a personal opportunity on the part of the three Defendants.
It is undisputed that these officers utilized some of the property belonging to the corporation in their acquisition of the Macon County management contract. This property included architectural plans, confidential marketing studies, the physical facilities, and an airplane, as well as employees of Greenetrack, their expertise, and training programs. In addition, in order for Defendants to obtain the contract, they pledged their stock in Greene Group as security to cover construction costs.
Defendants take the position that these resources were not corporate assets. They *462 argue that these resources were provided to the Macon County track at no cost to Greene Group. This argument, counter the Plaintiffs, perverts the test. It is not the cost to Greene Group that is determinative, say the Plaintiffs; rather, it is the value to Macon County that should be the focus of consideration.
Defendants further argue that Greene Group was paid an amount equal to the fair market value for the resources utilized by the Macon County track. Plaintiffs point out, however, that this fee paid to Greene Group was unilaterally set by these Defendants after the instant suit was filed. Moreover, say the Plaintiffs, as the two separate sums (the contract price with the Macon County track on the one hand, and the fair market value of the services rendered on the other) demonstrate, the Defendants cannot discharge their obligation to the corporation by obtaining the contract for themselves individually and then paying to the corporation a portion of the consideration under the guise of a fair value for the use of corporate facilities. In other words, Plaintiffs contend, even assuming that the one-half million dollar payment to the corporation represented the fair market value of the corporate services rendered for one year, the Defendants are entitled only to a credit in that amount and not a discharge of their obligation to pay all profits from the venture to the corporation.
Defendants also assert that they pursued the contract only after it became clear that Greene Group was not in a financial position to acquire it. Whether the corporation had the ability to pursue the contract is unclear. It is clear, however, as Plaintiffs contend, that the financial institution from which they in fact secured the loan would not accept the individuals' signatures, but required them to pledge their stock in Greenetrack. Plaintiffs further contend that the financial inability of the corporation to secure the contract is not the sole factor determining whether the officers could act on the opportunity in their individual capacity. Indeed, one authority has noted:
"If the corporation is unable to finance the opportunity, the directors and officers are, of course, not required to advance their personal funds to enable the corporation to finance it. However, the directors and officers should use their best efforts to secure the necessary financing. If they fail to do their best and personally take the opportunity, they cannot defend on the ground that the opportunity ceased to be a corporate opportunity because the corporation could not finance it." (Citations omitted.) H. Henn, Handbook of the Law of Corporations § 237 (2d ed. 1970).
Defendants' argument as to why this was a personal opportunity, as opposed to a corporate opportunity, hinges on two points. First, the existence of competition from another dog track was a given. Second, some group was going to manage the new dog track, and it was most likely going to be someone with experience. This management would either be by Greenetrack (or some of Greenetrack's people) or some other race track authority. Thus, it is better for Greenetrack for some of its people to run the new track (even if it cannot run it as a corporation) than for someone else to run it.
This argument revolves around the fact that the Macon County group was emphatic in its refusal to deal with Greene Group. Defendants contend that if they had not seized the opportunity, it would have been lost to both the corporation and the individuals.
Obviously, the trial judge accepted this contention; but the fallacy of this argument is this: Irrespective of the Macon group's statement that they did not want to do business with Greene Group, it was in fact the facilities, assets, and expertise of Greene Group that they were calling on for aid. It was not the individuals' facilities or expertise or assets that the Macon County group was seeking for the management of its racetrack. This is abundantly clear from what in fact did occur. The Macon County group did not in fact obtain the services of the individuals; rather, it received *463 what these individual defendants had access to through the Greene Group corporation.
The law dictates, under these facts, that a constructive trust be imposed on the net proceeds from this contract for the benefit of the corporation, including any salaries derived therefrom. We find a good statement of the rule in 19 C.J.S. Corporations § 785 (1940):
"When acting in good faith, a director or officer is not precluded from engaging in distinct enterprises of the same general class of business as the corporation is engaged in; but he may not wrongfully use the corporation's resources therein, nor may he enter into an opposition business of such a nature as to cripple or injure the corporation. If he does enter into such a business, equity will impress a trust for the benefit of the corporation on the profits arising therefrom, or on the competitive business itself, and it is immaterial that the corporation suffered no loss by the transaction; but a person may, as a condition to becoming an officer in a corporation, reserve the right to engage for his own benefit in a similar business at the same time. After the corporation has refused or failed to obtain a contract with a third person, a corporate director or officer is not precluded from contracting in his own behalf with such third person; and after a contract with a third person is set aside over the protest of the corporation, it is not damaged by the wrongful act of the officer or director in taking it in his own name. Certainly he owes no duty to the corporation not to engage in a similar business after he has severed his connection with the corporation. However, directors, officers, or agents, while ostensibly acting for the company, are not at liberty to divert to their own favor, or for the benefit of competitive corporations, business which should properly belong to the company which they represent; and this is true, even though their company is unable to finance the transaction, and although the directors, in good faith and because of such financial inability, have rejected the proposition for the corporation and have accepted it for themselves, using their own funds exclusively; and where they take a contract in their own name under such circumstances, they are trustees thereof and accountable in the company for the profits which they make out of the transaction." (Emphasis added.)
While this language is not altogether appropriate to the case at hand, it illustrates that in less severe factual contexts than that here presented, corporate officers cannot reject corporate opportunities and divert to their own favor business which properly belongs to their corporation.
The leading case in Alabama dealing with the corporate opportunity doctrine is Morad v. Coupounas, 361 So.2d 6 (Ala. 1978). In 1972, Morad and Coupounas formed Bio-Lab, Inc., as a plasmapheresis business. An initial office was opened in Birmingham, and it was intended that Bio-Lab would expand into certain other specified areas of the state, including Tuscaloosa. Dissension arose among the stockholders, which included Morad and Coupounas. In 1974, Morad incorporated another plasmapheresis business, Med-Lab, Inc., in Tuscaloosa.
Morad served as president of both corporations and worked "full time" for both. He jointly purchased insurance and suplies for both corporations and used the automobile supplied to him by Bio-Lab on business trips for Med-Lab. Also, orders for plasma from Bio-Lab were sometimes filled by Med-Lab. The Court found these incidents sufficient to amount to a usurpation by Morad of a corporate opportunity. Compare Gulledge v. Frosty Land Foods Int'l, Inc., 414 So.2d 60 (Ala.1982); and McKinstry v. Thomas, 258 Ala. 690, 64 So.2d 808 (1953), dealing with a corporate officer's entering into a competing business.
In two other factual contexts this Court has rejected the application of the corporate opportunity theory. The first was Cox & Perry, Inc. v. Perry, 334 So.2d 867 (Ala. *464 1976). Cox & Perry was a corporation formed to do general construction. In 1969, the corporation experienced financial difficulties. Later that year the corporation contracted to provide 200 mobile homes to the federal government for use as temporary housing for victims of Hurricane Camille. After several attempts, the corporation was finally able to arrange financing for the project, and the corporation was able to make a profit from the contract, which it was hoped would satisfy the corporate debts.
In 1970, Perry approached the same federal agency in order to secure for himself a contract to provide mobile homes to be used for the victims of Hurricane Celia. The shareholders sued, claiming that Perry had usurped a corporate opportunity. This Court held:
"The corporation had no pre-existing interest in the contracts. The corporation had no existing rights in the contracts. The corporation was created to do general construction; this purpose was in no way thwarted when Perry and Cummings secured contracts to provide mobile homes to the federal government. In addition, the corporation's insolvency affected the existence of a corporate opportunity. Consequently, Perry did not usurp a corporate opportunity by securing the Celia contracts for himself." 334 So.2d at 869.
Cox & Perry differs from the case at bar. As has already been noted, it is unclear whether Greene Group was in a financial position to pursue the management contract. There is no question, however, that the corporation was in an excellent overall financial condition and that the Defendants in fact secured the financing of the management contract for themselves upon the basis of the corporation's financial strength. Also, it was clearly one of Greene Group's corporate purposes to try to obtain the management contracts for any new tracks that were formed, whereas in Cox & Perry the corporation's purpose was general construction and not the brokering of mobile homes.
Another Alabama case dealing with the doctrine of corporate opportunity is Bauman v. Hayes, 379 So.2d 1251 (Ala.1980). The Hayeses owned a parcel of real estate, and in 1971 they agreed with Bauman and Greenberg to create a corporation to develop the land. Bauman and Greenberg were to provide the expertise, and the Hayeses were to supply the land. The agreement was to the effect that a majority vote would be necessary to demand additional land, and the voting stock was divided equally between the two factions.
When Bauman and Greenberg demanded more land for corporate development, the Hayeses refused. Bauman and Greenberg sued, claiming that the Hayeses were "`deliberately balking a corporate purpose' in order to secure personal advantage." The trial court found, however, that the corporation was formed for the limited purpose of developing the property only so long as both factions mutually agreed to its development. This Court affirmed the trial court's holding that no corporate purpose was disrupted. Again, Bauman differs from the case at bar in that, unmistakably, the corporate purpose of Greene Group was "deliberately balked."
The authoritative treatises are replete with instances of this nature which justify the imposition of a constructive trust. For example, Fletcher's Cyclopedia of the Law of Private Corporations states:
"This corporate right or expectancy, this mandate upon directors to act for the corporation, may arise from various circumstances; such as, for example, the fact that directors had undertaken to negotiate in the field on behalf of the corporation, or that the corporation was in need of the particular business opportunity to the knowledge of the directors, or that the business opportunity was seized and developed at the expense, and with the facilities of the corporation." 3 W. Fletcher, Cyclopedia of the Law of Private Corporations, § 861.1, at p. 208 (perm. ed. 1975).
It further states:

*465 "If it is the duty of officers in a particular case to enter into a contract ... on behalf of the corporation, and, in violation of this duty, they enter into the contract ... personally, they will not be permitted to retain the benefit, but will be held as trustees for the corporation. Directors `must remember that they are not at liberty to sacrifice the interests which they are bound to protect, and, while ostensibly acting for the company, divert in their own favour business which should properly belong to the company they represent.'" (Citation omitted.) Id., at p. 210.
Finally, it concludes:
"Whether or not an officer has misappropriated a corporate opportunity does not depend on any single factor. On the contrary, `numerous factors are to be weighed, including the manner in which the offer was communicated to the officer; the good faith of the officer; the use of corporate assets to acquire the opportunity; the degree of disclosure made to the corporation; the action taken by the corporation with reference thereto; and the need or interest of the corporation in the opportunity. These, as well as numerous other factors, are weighed in a given case. The presence or absence of any single factor is not determinative of the issue of corporate opportunity.'" Id., at p. 34 of cum. supp. (citing Morad v. Coupounas, 361 So.2d 6 (Ala.1978)).
Stated succinctly, the rule is this: "Corporate personnel may not for personal gain divert unto themselves the opportunities which in equity and fairness belong to their corporation." H. Henn, Handbook of the Law of Corporations § 237 (2d ed. 1970).
Also, the following is true, particularly with respect to the case at bar:
"Obviously, if the corporation has been seeking such an opportunity, ... or its funds have been involved in financing the opportunity or its facilities or personnel have been used in developing the opportunity, the opportunity in justice should belong to the corporation." Id.

We hold, therefore, under the undisputed facts of this case, that the majority stockholders impermissibly acted in their individual capacities in contracting with the Macon County group for the construction and operation of the Macon County track. Consequently, the judgment is reversed and this cause is remanded for further proceedings, to include an accounting with respect to Defendants Bryant's, Phelps's, and May's shares of stock in Pari-Mutuel Management, Inc., and the net value of the proceeds earned by these Defendants from the Macon County venture, including salaries, dividends, or other distribution of profits earned as officers of the operating corporation. The court is further directed to impress a constructive trust in favor of Greene Group, Inc., consistent with the results of the accounting. As a condition for the imposition of a constructive trust, as herein ordered, the trial court in its discretion may direct these Plaintiffs, or the corporation for whose benefit they seek relief, to assume certain obligations commensurate with the relief granted, as equitable principles and good conscience may require.
REVERSED AND REMANDED WITH INSTRUCTIONS.
MADDOX,[*] JONES, SHORES, ADAMS and STEAGALL, JJ., concur.
ALMON and HOUSTON, JJ., specially concur in part and dissent in part.
HOUSTON, Justice (dissenting in part and specially concurring in part).
This case was presented to the trial court ore tenus, and on that fact hangs some of my disagreement with the majority.
When evidence is presented ore tenus without a jury, factual findings are presumed *466 correct and judgment based thereon will not be disturbed on appeal unless it is plainly and palpably erroneous. Wadsworth House Movers, Inc. v. Salvage One Demolition, Inc., 474 So.2d 686 (Ala.1985); Etheridge v. Yeager, 465 So.2d 378 (Ala. 1985); 2B Alabama Digest § 1008.1(5). This Court must affirm the trial judge's decision if, under any reasonable aspect, it is supported by any credible evidence. Chism v. Hicks, 423 So.2d 143 (Ala.1982). Furthermore, where a trial court does not make specific findings of fact concerning an issue, this Court will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous. Thomas v. Davis, 410 So.2d 889 (Ala.1982).
As an appellate court, we have neither the luxury nor the burden that the trial court has as trier of fact. The trial court found that there was no corporate opportunity for Greene Group, Inc., as a corporate entity. Is there credible evidence to support this finding? Yes. The testimony of Milton McGregor supports this. The testimony of Paul Bryant, Jr., supports this.
The majority disposed of this by making its own findings that the Macon Group wanted and received the facilities, assets, and expertise of Greene Group and not of the individuals, Bryant, Phelps, and May; and, therefore, that Greene Group, in reality, had the corporate opportunity, for if the Macon Group had not dealt with the individuals it would have had to deal with Greene Group.
This appellate finding may or may not be supported by credible evidence. After reading the transcript and exhibits, I am of the opinion that what the Macon Group wanted was Bryant's, Phelps's, and May's financial strength and Bryant's, Phelps's, and May's particular expertise. To me it appears that most of what Macon County received from Greene Group, Greene Group had received free of charge from the management groups of the greyhound facilities in Mobile and Pensacola, and, to a lesser extent, Ebro, Florida, and that the Macon Group could have received what it received from Greene Group from the management of these or other greyhound facilities.
In my opinion, the trial court's finding that Greene Group had no corporate opportunity is amply supported by credible evidence and, therefore, is not plainly and palpably wrong.
The trial court found that the Macon County track is a competing enterprise as to the Greene County track. The testimony of defendants May and Bryant support this. The testimony of the plaintiff, Bradley Brown, and Dr. J. Barry Mason support this. (Dr. Mason projected an annual loss in Greenetrack's "handle" of approximately $14,000,000 as a result of the operation of the Macon County track, which would result in an economic loss to Greenetrack of approximately $2,000,000.) The finding by the trial court that the Macon County track is a competing enterprise as to Greenetrack is supported by credible evidence.
It is without dispute that Bryant, Phelps, and May were directors of Greene Group, Inc., the sole owner of Greene County Greyhound Park, Inc., at the time they formed and became directors of Pari-Mutuel Management, Inc. Pari-Mutuel Management, Inc., obtained the contract to manage the Macon County track. Therefore, these threea majority of the directors of Greene Group, Inc.are the sole stockholders and directors of the company that is managing the Macon County track, which is a competing enterprise as to the dog track owned by Greene Group, Inc.
There is no dispute about Greene Group, Inc., being well managed by Director Bryant, whose business acumen was acclaimed by even some of the plaintiffs. There was no complaint, except for the amount paid as dividends, about the management of Greene Group, Inc.
The trial court found: "That there is no evidence of abuse or breach of fiduciary duty and the Defendants acted in good faith."
There is credible evidence to support the finding that the defendants acted in good *467 faith; however, directors, even in good faith, may not engage in an enterprise competing with the corporation of which they are directors.
"When acting in good faith, a director or officer is not precluded from engaging in distinct enterprises of the same general class of business as the corporation is engaged in; but he may not wrongfully use the corporation's resources therein, nor may he enter into an opposition business in such a nature as to cripple or injure the corporation...." (Emphasis added.)
19 C.J.S. Corporations § 785 (1940).
"But the directors must act in good faith toward the corporation of which they are directors, and it seems that they may not, even in good faith, engage in a rival business to its detriment....
"Moreover, where the director or officer has breached his trust to the corporation in this regard, equity will intervene to impress a trust for the benefit of the corporation upon the profits arising from the competitive business, or upon the competitive business itself." (Emphasis added.)
3 W. Fletcher, Cyclopedia of the Law of Private Corporations § 856 (rev. perm. ed. 1975).
"[T]he directors or officers of a going, solvent corporation cannot engage in a competing business to the detriment of the corporation which they represent. Nor does the right of an officer or director to engage in enterprises of the same nature entitle him to enter into transactions of such a nature as to cripple or injure the company's business, or hinder or defeat it...." (Emphasis added.)
18B Am.Jur.2d Corporations § 1712 (1985).
Evidence that directors engaged in an enterprise competing with the corporation of which they are directors is evidence of a breach of a fiduciary duty.
The trial court found that "Bryant, Phelps, and May were actively involved in other business endeavors not connected to Greene Group, Inc., and kept excellent records of the use of corporate property for personal purposes for which Greene Group was reimbursed." This fact has no bearing on whether Bryant, Phelps, and May breached their fiduciary duty by maintaining a position in and managing a competing enterprise to the injury and detriment of the first corporation they still served.
The trial court found "That the competing enterprise, Macon County Greyhound Park, Inc., would exist with or without the participation of Bryant, Phelps, and May." While there is credible evidence to support this finding, it has absolutely no bearing upon the question of whether Bryant, Phelps, and May can, over the objections of the minority stockholders, set up a separate corporation and manage a competing enterprise which will injure or damage Greenetrack while they are, and continue to be, the principal officers and directors of Greenetrack.
The trial court found "The management contract between Pari-Mutuel Management, Inc., and Macon County Greyhound Park, Inc., produces a fee to Greene Group, Inc."
Payment to Greenetrack of one-sixth of the sums received by Pari-Mutuel Management, Inc., from the Macon track, even though no such payment would have been received if third parties had had the management contract for the Macon track, would not obliterate the breach of the fiduciary duty not to engage in a competing enterprise.
Pari-Mutuel Management, Inc., which is owned by Bryant, Phelps, and May, who are also its directors and officers, has a 21-year management contract with Macon County Greyhound Park. Pari-Mutuel obtained a $10 million, 21-year loan from Union Planters National Bank of Memphis, Tennessee, to build the dog track in Macon County. This loan was personally guaranteed by Bryant, Phelps, and May. To obtain that loan, Bryant, Phelps, and May, as directors and majority stockholders of *468 Greene Group, Inc., covenanted with Union Planters Bank as follows:
"9.14 Covenants of Guarantors [Bryant, Phelps, and May]. Guarantors agree not to permit any merger, sale of assets, dissolution or liquidation of Greene Group, Inc., or to dispose of any ownership or control of Alabama Reinsurance Company, Inc., and Greene Group, Inc., without first receiving the consent of the bank. Guarantors shall make no conveyance or assignment of their stock of Greene Group, Inc., nor allow the issuance of further stock resulting in Guarantors owning less than 50.1% of the voting and equity securities of said corporation."
It is evident that a majority of the board of directors and the owners of 50.1% of the stock in Greene Group, Inc., have pledged their votes as stockholders and directors to refrain from permitting Greene Group, Inc., to do certain things for a 21-year period, regardless of what is in the best interest of Greene Group, Inc., so that financing could be obtained to construct and initially operate a competing enterprise.
The finding of the trial court that there was no breach of a fiduciary duty is plainly and palpably wrong and is a misapplication of the applicable principles of law to the facts of the case.
In accordance with equitable principles, I would remand to the trial court for the trial court to impose a constructive trust on Pari-Mutuel Management, Inc., in favor of Greene Group, Inc., upon the happening, within a reasonable time frame set by the trial court, of one of the following two things: (1) Union Planters' permitting Greene Group, Inc., to endorse the $10 million loan of Pari-Mutuel Management, Inc., and discharging Bryant, Phelps, and May from their personal guarantees; or (2) proper execution of an indemnification agreement by Greene Group, Inc., to Bryant, Phelps, and May, whereby Greene Group, Inc., agrees to indemnify Bryant, Phelps, and May for any obligation they may incur in connection with the $10 million loan from Union Planters, with the understanding that the stockholders in Greene Group, Inc., other than Bryant, Phelps, and May, will individually guarantee Greene Group, Inc.'s indemnification of Bryant, Phelps, and May, with each stockholder's individual guaranty being limited to his or her percentage of ownership in Greene Group, Inc.
ALMON, J., concurs.
NOTES
[*] Although Justice Maddox did not sit in oral arguments, he has listened to the tape of oral argument and studied the briefs.