ON APPLICATION FOR REHEARING
This Court's opinion of September 14, 1990, is withdrawn and the following is substituted as the opinion of this Court.
A suit in equity among stockholders for control of a small corporation best describes this case, which has at various times involved numerous parties and a plethora of complex issues.
American Family Care, Inc. ("AFC"), operates six free-standing out-patient family practice medical clinics. Dr. D. Bruce Irwin owned 47% of the capital stock of AFC; Dr. James D. Blake owned 38%; and Lankford Investment Company, Ltd. ("LICO"), owned 15% (706 shares). Irwin and Blake disagreed about a number of topics. After the board of directors (Irwin, Blake, and Frank Lankford) elected Blake as president of AFC, a position that Irwin had held since the incorporation of AFC, Irwin resigned his positions as an officer (he had been elected vice president) and director of AFC. Irwin sued AFC, demanding possession of, and amounts due as rent for, one of AFC's places of business that was owned by Irwin and Blake, as individuals, and that was leased to AFC. AFC, Blake, and LICO filed a complaint for an injunction and allied equitable relief against Irwin.
As a counterclaim, Irwin filed a stockholder's derivative action on behalf of AFC against Blake, Lankford, and AFC. LICO *Page 1055 
had purchased its 706 shares of AFC stock in 1984 for $1,000,000. While this action was pending, LICO sold this stock in AFC to American Family Partners ("the partnership") for $750,000. The partnership was composed of six physicians (including Blake) and The Physicians P.C. ("P.C."), as partners. Irwin had offered LICO $650,000 and $25,000 a year for three years for the stock. P.C. later purchased the 706 shares of AFC stock from the partnership by borrowing $700,000 and giving the partners in the partnership $50,000 in Class B preferred stock in P.C. with a preference on liquidation of the 706 shares of LICO stock.
After hearing ore tenus evidence, the trial court made detailed findings of fact. The following findings of fact are pertinent to this appeal:
 "12. From time to time . . . there have been discussions concerning the sale of the stock of . . . AFC to outside parties. . . . Irwin and Lankford discussed the possible purchase of LICO stock by Irwin. Discussions or negotiations then took place between Lankford and other doctors in [P.C.] and it was finally decided that the LICO stock would be sold to a group of such doctors. A partnership styled American Family Partners ('the Partnership') was formed by some, but not all, of the doctors in [P.C.] for the purpose of purchasing the LICO stock for $750,000.00. Blake was the managing partner of the Partnership. The transfer of LICO's 706 shares of stock took place in May, 1987. During the discussions with the doctors agreeing to purchase the stock, Blake suggested that perhaps 'matching funds' would be available from AFC. In order to purchase the LICO stock, the Partnership borrowed the $750,000.00 from Central Bank of the South ('Central Bank'). In connection with the loan, Blake and the other individual members of the Partnership guaranteed the repayment of the loan, [P.C.] guaranteed the repayment (even though not all doctors in [P.C.] were members of the Partnership), and South Highland Hospital Association guaranteed the repayment of the loan. The Partnership pledged the LICO stock and Blake pledged his personal stock as security for the loan. The Central Bank loan called for principal payments to be made in eleven equal monthly installments of $4,167.00 each with the unpaid balance being due in the twelfth month. Individual members of the Partnership made payment to [P.C.] and [P.C.] made the payment to Central Bank. On several occasions some of the doctors didn't make their monthly payments and [P.C.] had to cover for them.
 "13. Upon the acquisition of the LICO stock, the Partnership executed a Voting Trust Agreement by which it authorized Blake to vote the 706 shares of stock, thus giving Blake effective control of AFC.
 "14. Several events occurred in the spring of 1988. The Partnership decided to sell the LICO stock to [P.C.]. In order to purchase the LICO stock [P.C.] had to borrow the money from SouthTrust Bank of Alabama ('SouthTrust') and the loan was guaranteed by Baptist Medical Center which in turn required the pledge of the LICO stock and Blake's personal stock as security for the guarantee. By the Spring of 1988 several members of the Partnership had stopped practicing medicine with [P.C.] and had gone to other jobs, hospitals or clinics. The Partnership fell behind in its payments to [P.C.] for [P.C.'s] payment on the Central Bank Note and in fact [P.C.] made the last three monthly payments without receiving payments from the doctors. [P.C.] agreed to purchase the LICO stock for $750,000.00 by paying $700,000.00 cash and issuing $50,000.00 of Class B Preferred Stock. The Partnership was then liquidated and its assets distributed to its members. The $700,000.00 was borrowed from SouthTrust. Although Blake was not an officer of [P.C.], he was the principal person involved [in] negotiating the transaction with SouthTrust and Baptist Medical Center. The SouthTrust Note called for 59 consecutive monthly payments of $7,523.00 (as adjusted for fluctuation in the interest *Page 1056 
which was to be the bank's base rate plus .5% or 9.5% at first). The unpaid balance was due on the 60th payment. Although the issue is strongly contested, the Court finds that AFC increased its payments to [P.C.] by $1,000.00 per doctor per month in 1988 in order to provide [P.C.] with the funds necessary to pay the monthly payments on the [P.C.] notes, first to Central Bank and then to SouthTrust. This increase in payments from AFC to [P.C.] was made without amending the PC Agreement as required by its terms. Upon its acquisition of the LICO stock, [P.C.] executed an Addendum to the Voting Trust Agreement by which it authorized Blake to vote the 706 shares of stock.
 "15. It has been argued that the $1,000.00 per doctor per month increase in the payments from AFC to [P.C.] was not for the purpose of allowing [P.C.] to purchase the LICO stock from the Partnership but instead was to give the doctors in [P.C.] a raise. However, none of the increase has been passed on through to the doctors. Furthermore, this transaction, including the Voting Trust Agreement, simply can not be viewed in a vacuum. It took place while this case was pending and while the control of AFC was definitely in dispute.
 "Many of the facts set out above are very strongly disputed and in making its findings above and [in] the opinion below the Court has considered not only the documents and evidence submitted to it but the demeanor of the parties and witnesses and the interests and biases shown by the parties and witnesses. This is one of those cases where it is simply not possible that all witnesses spoke the truth all of the time. In making its decision in this case the Court does not mean to imply that it believed everything that any party stated from the witness stand.
 "It is the opinion of the Court that at least after the purchase of the LICO stock by the Partnership failed, the purchase of the stock by [P.C.] was contrived, primarily by Blake, in order to prevent Irwin or someone who might support Irwin from acquiring the stock. It is likely that the original purchase of the LICO stock by the Partnership falls in that same category but that is not really material to this decision except to the extent that [P.C.] paid, with money supplied by AFC, the Central Bank note payment for the Partnership when not all of the members of [P.C.] were members of the Partnership. The money used for the purchase of the 706 shares of stock was the money of AFC and thus, in some manner, AFC should receive the value or benefit of the stock purchase."
Additional findings made by the trial court are as follows:
 "16. The Court finds that AFC increased its payments to [P.C.] by ONE THOUSAND AND NO/100 DOLLARS ($1,000.00) per doctor per month in 1988 in order to provide [P.C.] with the funds necessary to pay the monthly payment on the [P.C.] note. It is, therefore, the opinion of the Court that Title 10-2A-22, Code of Alabama, 1975 does not preclude the Court from finding that AFC has in effect purchased shares of its stock even though such purchase may be in violation of such Code Section and the Court finds that it may take action to correct what it has determined to be an improper action on the part of AFC. The Court further finds that the ONE THOUSAND AND NO/100 DOLLARS ($1,000.00) per doctor per month increase was not compensation to the doctors."
The first issue presented is whether preferred stockholders of a corporation are indispensable, necessary, or proper parties under Rule 19(a), A.R.Civ.P., to an action brought to impose a constructive trust on a major asset of the corporation of which they are preferred stockholders.
Subject to the prohibition in Alabama Constitution of 1901, § 237 ("[n]o corporation shall issue preferred stock without the consent of the owners of two-thirds of the stock of said corporation"), a corporation, when provision is made therefor in its articles of incorporation, may issue shares of preferred stock that have preference over some other class or classes *Page 1057 
of shares as to payment of dividends or preference in assets upon the voluntary or involuntary liquidation of the corporation. Ala. Code 1975, §§ 10-2A-32, -33.
Complete relief can be accorded to the parties to this action without the preferred stockholders' being made parties, so the preferred stockholders are not necessary for a just adjudication. Rule 19(a)(1).
Do the preferred stockholders claim "an interest relating to the subject of the action" and are those stockholders "so situated that the disposition of the action in [their] absence may . . . impair or impede [their] ability to protect that interest or leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of [their] claimed interest" so that the preferred stockholders are necessary for a just adjudication (Rule 19(a)(2)(i) and (ii))?
Clearly, a judgment against a corporation or a constructive trust imposed upon a major asset of a corporation may have a financial impact upon the preferred stockholders of that corporation. Professor Moore discusses the kind of interest that one must have in order to be an indispensable party under the Federal Rules of Civil Procedure:
 "The 'interest relating to the subject matter of the action,' that makes an absent person a party needed for just adjudication, must be a legally protected interest, and not merely a financial interest or interest of convenience."
3A Moore's Federal Practice § 19.07 1[2], pp. 19-99 (1989).
This statement from Moore's was cited as the proper interpretation of Rule 19(a)(2), A.R.Civ.P., in Realty GrowthInvestors v. Commercial Indus. Bank of Memphis, Tennessee,370 So.2d 297, 304 (Ala.Civ.App. 1979), cert. denied,370 So.2d 306 (Ala. 1979).
Stockholders do not by virtue of their stock ownership acquire a legally protected interest in the assets of the corporation of which they are stockholders. First National Bankof Birmingham v. Perfection Bedding Co., 631 F.2d 31 (5th Cir. 1980) (applying Alabama law).
The preferred stockholders did not have a security interest in the capital stock of AFC, and the mere financial interest that they did have was an indirect financial interest in the capital stock of AFC that was owned by P.C., of which they were preferred stockholders. Therefore, the preferred stockholders had no legally protected interest in the capital stock of AFC that was owned by P.C. This being the case, our standard of review of the decision of the trial court to deny the joinder of the preferred stockholders is limited to whether the trial court abused its discretion. Ross v. Luton, 456 So.2d 249
(Ala. 1984). All of the preferred stockholders knew of the pendency of this action, because they were subpoenaed to testify, and some did testify, at the trial of this case. They could have intervened to protect their financial interests, but they elected not to do so.
Likewise, the corporation of which they were preferred stockholders and one preferred stockholder (Blake), who had the same indirect financial interest that these preferred stockholders had, were parties to this action. 3A Moore'sFederal Practice § 19.07 1[2], pp. 19-106, 19-108 (1989), states:
 "The language [in Rule 19(a)] 'as a practical matter' has a restrictive as well as an expansive side. Thus the fact that the absent person may be bound by the judgment does not of itself require his joinder if his interests are fully represented by the parties present; nor does the mere theoretical possibility of prejudice require a joinder."
(Emphasis supplied.)
For the above reasons, we cannot hold that the trial court abused its discretion and thereby committed reversible error by failing to join these preferred stockholders of P.C.
AFC, but not Blake, argues that the trial court committed reversible error by receiving, over objection, "illegal character and reputation evidence relating to parties and witnesses." *Page 1058 
Irwin contends that evidence of specific misconduct was not introduced to prove Blake's bad character or reputation by specific instances of misconduct. Rather, Irwin argues, and we agree, that misconduct of an officer/director of a corporation is relevant to a claim for breach of fiduciary duty and is relevant to establish a defense of unclean hands. We are convinced, as was the trial court, that Irwin introduced this evidence — specific incidents of misconduct — to establish his claim of breach of fiduciary duty (by showing reasons why the morale at AFC was low at the time Irwin was replaced as president) against both Blake and Lankford and to establish Irwin's defense of unclean hands against Blake. The trial court did not err in admitting this evidence.
The trial court, based upon its findings of fact, entered decretal paragraphs one through eight, of which only paragraphs one, two, and three are relevant to this appeal:
 "ONE: A constructive trust, for the benefit of AFC is hereby imposed upon the 706 shares of AFC stock which was originally owned by LICO, then sold to the Partnership and then sold to [P.C.]. AFC shall be primarily liable to SouthTrust for the payment on the $700,000.00 note to [P.C.] which was used for the purchase of the 706 shares of stock and so long as Baptist Medical Center remains as a guarantor of the SouthTrust note, the 706 shares of stock shall remain as security for that guaranty.
 "TWO: The Voting Trust Agreement executed by the Partnership and the Addendum To Voting Trust Agreement executed by [P.C.] is hereby set aside and voided. So long as the 706 shares of AFC stock are held in constructive trust for the benefit of AFC, Irwin shall have the right to vote 388 shares of the stock and Blake shall have the right to vote 318 shares.
 "THREE: Irwin is awarded $57,781.56 as a reasonable attorney's fee for having the constructive trust imposed upon the 706 shares of AFC stock. Judgment is therefore rendered in favor of Irwin and against AFC for $57,781.56."
The trial court imposed a constructive trust on the 706 shares of AFC stock in favor of AFC and required AFC to pay the note owed to SouthTrust Bank by P.C., which was secured by the 706 shares of AFC stock. AFC, Blake, and P.C. challenge the trial court's power and right to do this, because they argue (1) there were no grounds for the imposition of a constructive trust; (2) the order requires AFC to repurchase its own stock, in violation of § 10-2A-22(a); and (3) there is an adequate remedy at law.
A constructive trust "bears much the same relation to an express trust that a quasi contractual obligation bears to a contract. . . . [A]n obligation is imposed not because of the intention of the parties but to prevent unjust enrichment." 3Scott on Trusts § 462.1 (1939).
Equity may impress a constructive trust on property in favor of one beneficially entitled thereto when another holds title to the property by fraud, commission of wrong, abuse of a confidential relationship, or any other form of unconscionable conduct. Keeton, Law of Trusts, 210 (5th ed. 1949); 4 Pomeroy,Equity Jurisprudence, § 1053 (5th ed. 1941); Walsh on Equity, § 106 (1930). There is no evidence that P.C. obtained the 706 shares of AFC stock by any of these methods.
Equity may also impress a constructive trust on property in favor of one beneficially entitled thereto against a person, who, against the rules of equity and against good conscience, in any way either has obtained or holds and enjoys legal title to property that in justice that person ought not to hold and enjoy. 3 Scott on Trusts § 462.1 (1939); Restatement(Restitution) § 160, Comment A (1937).
 "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, *Page 1059 
equity converts him into a trustee.
Beatty v. Guggenheim Exploration Co., 225 N.Y. 380,122 N.E. 378, 380 (1919).
We are not factfinders. Our standard of review requires that we accept as true the facts found by the trial court, if there is substantial evidence to support the trial court's findings, either directly or through reasonable inference. The trial court found that AFC increased its payments to P.C. in order to provide P.C. with the funds necessary to pay the loan that had been incurred by P.C. in order to acquire the 706 shares of AFC stock. This finding can be supported by reasonable inferences that can be drawn from the evidence before the trial court. The trial court could reasonably have inferred from the evidence, as it did, "[t]hat at least after the purchase of the LICO stock by the Partnership failed, the purchase of the stock by[P.C.] was contrived, primarily by Blake, in order to prevent Irwin or someone who might support Irwin from acquiring the stock." (Emphasis supplied.) The court added:
 "It is likely that the original purchase of the LICO stock by the Partnership falls in that same category, but that is not really material to the discussion except to the extent that [P.C.] paid, with money supplied by AFC, the Central Bank note payment for the Partnership when not all of the members of [P.C.] were members of the Partnership.
The money used for the purchase of the 706 shares of stock was the money of AFC and thus, in some manner, AFC should receive the value or benefit of the stock purchase."
(Emphasis supplied.)
Blake was the president and chief executive officer of AFC. It would have been his decision for AFC to pay the money to P.C. in order to allow P.C. to pay the indebtedness of P.C. caused by the purchase of AFC stock. Although Blake was not an officer of P.C., he owned more stock in P.C. than any other stockholder, and P.C. adopted a resolution that allowed Blake to vote the 706 shares of AFC stock owned by P.C. Blake owned 38% of the common stock of AFC. The 706 shares purchased by P.C. represented 15% of the stock in AFC. Therefore, Blake had the right to vote 53% of the stock of AFC. Blake, as president and a director of AFC, owed a duty of loyalty to the other directors and stockholders of AFC. The trial court found that Blake had breached that duty. The breach of that duty calls to mind the aphorism of Justice Cardozo in Meinhard v. Salmon,249 N.Y. 458, 164 N.E. 545, 548 (1928):
 "A constructive trust is, then, the remedial device through which preference of self is made subordinate to loyalty to others."
Irwin, in his counterclaim, which was a stockholder's derivative suit, sought the remedial device of a constructive trust to make Blake's preference of self subordinate to his loyalty to all of the stockholders of AFC. There was a ground for the imposition of a constructive trust, because P.C. held and enjoyed legal title to the 706 shares of AFC stock as a result of funds having been wrongfully diverted from AFC to P.C. to allow P.C. to pay for this stock.
AFC, Blake, and P.C. contend that the trial court was without power or jurisdiction to require AFC to pay the $700,000 to SouthTrust Bank because, they argue, such a payment violates Ala. Code 1975, § 10-2A-22(a), which provides:
 "A corporation shall have the right to purchase, take, receive or otherwise acquire, hold, own, pledge and transfer or otherwise dispose of its own shares, but purchases of its own shares, whether direct or indirect, shall be made only to the extent of unreserved and unrestricted earned surplus available therefor, and, if the articles of incorporation so permit or with the affirmative vote of the holders of two thirds of all shares entitled to vote thereon to the extent of unreserved and unrestricted capital surplus available therefor."
"Earned surplus" is defined in § 10-2A-2(5) as:
 "The portion of the surplus of a corporation equal to the balance of its net profits, income, gains and losses from *Page 1060 
the date of incorporation, or from the latest date when a deficit was eliminated by an application of its capital surplus or stated capital or otherwise, after deducting subsequent distributions to shareholders and transfers to stated capital and capital surplus to the extent such distributions and transfers are made out of earned surplus. Earned surplus shall include also any portion of surplus allocated to earned surplus in mergers, consolidations or acquisitions of all or substantially all of the outstanding shares or of the property and assets of another corporation, domestic or foreign."
AFC, Blake, and P.C. argue that because the trial court concluded that AFC had effectively purchased 706 shares of its own stock in the spring of 1988 when it agreed to increase its payments to P.C., at which time AFC's earned surplus was only $5,410, and because its earned surplus was only $103,344 at the time of trial, the trial court could not fashion a remedy that was violative of the Alabama Business Corporations Act and the decisions of this Court, i.e., Jebeles v. Costellos,391 So.2d 1024, 1026 (Ala. 1980).
The earned surplus restrictions contained in § 10-2A-22(a) are designed to protect third-party creditors and minoritystockholders from mismanagement by officers or directors whereby the officers or directors deplete the capital of the corporation by having it acquire its own shares. The earned surplus restrictions are not designed to protect the party that caused the repurchase of the stock. See Triumph Smokes, Inc. v.Sarlo, 482 S.W.2d 696, 698 (Tex.Civ.App. 1972) (interpreting a Texas statute that limited a corporation's power to purchase its own stock to the extent of its unrestricted earned surplus). It is the general rule that "a corporation cannot itself have a stock repurchase declared illegal, nor can creditors who are not injured have a right to complain" of a violation of the statutory earned surplus restriction. LaVoySupply Co. v. Young, 84 Idaho 120, 369 P.2d 45, 49 (1962), citing 6A Fletcher, Encyclopedia Corporations, § 2861. In light of the fact that they are the parties who developed the improper scheme, neither AFC, Blake, nor P.C. has standing to raise, and they are estopped from raising, the issue of the insufficiency of the earned surplus.
The trial court did not impose any obligation on AFC that did not otherwise already exist, for it found that the purpose of artificially increasing the compensation paid to P.C. by AFC was to provide P.C. with sufficient funds to make the note payments first to Central Bank and then to SouthTrust Bank. The proceeds of these loans were used to purchase the 706 shares of AFC stock. The trial court simply ordered AFC to continue to make those monthly payments, but without funneling the money through P.C. The trial court looked through the "form" of this transaction to the "substance" of the transaction, which was AFC's paying for stock that it did not own. Therefore, the trial court merely ordered AFC to continue to make the monthly payments, as it had been doing since May 1988. The only difference was the name of the payee. Thus, the trial court did not impose any new or different obligation upon AFC that AFC and Blake had not previously created. The trial court gave AFC the benefit of what it had been paying for.
Section 10-2A-22 does not in any way limit the remedies of an equity court to rectify a wrong if third-party creditors and minority stockholders are not harmed by the remedy. There was no evidence that third-party creditors or minority stockholders who had not participated in the improper schemes would be harmed by imposing a constructive trust and by requiring AFC to continue to repay the $700,000 obligation to SouthTrust.
Will equity specifically enforce the duty of the constructive trustee to convey the property held in constructive trust if there is an adequate remedy at law? The "Titans of Trust" disagree on this question.
Professor Bogert in Bogert, Trust and Trustees § 472 (1946), asserts:
 "In many cases where a constructive trust is decreed, the plaintiff has the choice between a remedy at law and the *Page 1061 
constructive trust or another remedy in equity. In a suit to obtain a constructive trust, it should not be necessary to prove the inadequacy of the remedy at law. . . ."
(Emphasis supplied.)
Professor Scott asserts that the presence of an adequate remedy at law precludes the enforcement of a constructive trust:
 "Ordinarily where property is held by one person upon a constructive trust for another, a court of equity will specifically enforce the duty of the constructive trustee to convey the property to the other. There are, however, situations in which it is held that because the remedy at law is adequate equity will not specifically enforce the duty of the constructive trustee. Thus where the title to a chattel that is not unique is obtained from the owner by fraud, it is held that the fraudulent person is liable in an action at law for conversion, and since the legal remedy is adequate he will not be compelled in a proceeding in equity specifically to restore the chattel. It does not follow, however, that he does not hold the property upon a constructive trust."
5 Scott on Trusts § 462.3 (4th ed. 1989). (Emphasis supplied.)
Equity is a system of remedies that evolved to redress wrongs that were not recognized by or adequately righted by the common law.
After reviewing many cases and treatises, we are persuaded that the conclusion reached in "Must the Remedy at Law Be Inadequate Before a Constructive Trust Will Be Impressed?", which appeared in the Notes and Comment section of 25 St. John's L.Rev. 283, 295 (1951), succinctly summarizes the authorities and is the better rule of law:
 "[E]xpress trusts are enforceable in equity at the suit of the cestui que without regard to the adequacy of the remedy at law. However, as to constructive trusts, while equity has the power to act, it will not; unless a fiduciary or quasi-fiduciary relation is involved, or unless relief at law would be inadequate because the chattel is unique or the defendant-wrongdoer is insolvent."
We adopt that rule.
The asset into which the funds of AFC were improperly diverted is unique, for the ownership of that asset will determine who will control AFC. Power is unique.
Even so, a constructive trust is a remedy created to prevent unjust enrichment. The partnership bought the 706 shares of AFC stock from LICO for $750,000. P.C. bought the stock from the partnership for $750,000. The remedy fashioned by the trial court permits AFC to acquire this stock for $50,000 less than its value as established by the sale from LICO to the partnership and from the partnership to P.C., and $25,000 less than Irwin offered LICO for the stock. Individual investors, who have breached no fiduciary duties, are adversely affected; and to the extent that AFC acquired this asset for less than its market value, AFC has been unjustly enriched.
The trial court is authorized in equity proceedings to mold its judgment so as to adjust the equities of all the parties and to meet the obvious necessities of each situation. BBCInvestment Co. v. Ginsberg, 280 Ala. 148, 190 So.2d 702 (1966).
Therefore, the judgment is modified to permit the constructive trust to be dissolved upon P.C.'s satisfying the trial court, within a reasonable time to be set by the trial court, that P.C. has repaid to AFC all sums that AFC has paid directly to SouthTrust on P.C.'s note to SouthTrust; and all sums that AFC has paid to P.C. since January 1, 1987, as the result of Blake's breach of fiduciary duties owed to AFC, plus interest at the legal rate of 12% per annum from the date of such payments.
Until the trial court is satisfied that all such payments have been made, decretal paragraphs one and two, previously set out in this opinion, shall remain in full force and effect. *Page 1062 
In a stockholder's derivative action, when the stockholder confers a substantial benefit upon the corporation, the stockholder bringing the derivative action is entitled to recover a reasonable attorney fee from the corporation.Coupounas v. Morad, 380 So.2d 800 (Ala. 1980).
We cannot hold that the trial court erred in determining that Irwin's action conferred substantial benefits upon AFC.
There is no support for AFC's argument that the attorney fee was unreasonable or unnecessary. Therefore, there is no factual support for AFC's argument that the finding by the trial court that the fee was reasonable and necessary is against the great weight of the evidence. We will not reverse on this issue.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED AS MODIFIED; APPLICATION OVERRULED.
HORNSBY, C.J., and JONES, SHORES and KENNEDY, JJ., concur.