This is an appeal by Med-Lab, Inc. and its stockholders from a final decree finding them liable for misappropriation of the corporate opportunity of Bio-Lab, Inc., and ordering them to offer 30% of the stock of Med-Lab to Coupounas. We affirm the order that Med-Lab is liable to Bio-Lab, but reverse and remand as to the remedy ordered by the trial court.
Bio-Lab, Inc. was formed in 1972 by Joseph Morad, Joseph Thomson, George Coupounas, and Dr. June Shaw for the purpose of establishing a plasmapheresis business. In this business, red blood cells are separated from the plasma of a paid blood donor and returned to the donor's circulatory system. The plasma is then sold to biological manufacturing companies. Initially, Bio-Lab opened an office in Birmingham with Morad, who had approximately 5 1/2 years experience in the plasmapheresis business, as president. Coupounas, a resident of Massachusetts, was to handle the books. The trial court specifically found that one *Page 8 
of the purposes of the creation of Bio-Lab was to expand its operations by opening new offices in certain specified areas of the state, including Tuscaloosa.
By mid-1973, dissension had arisen among the directors and stockholders of Bio-Lab over Morad's compensation. Testimony and exhibits examined by the trial court indicated that at this same time discussions were held on expansion to Tuscaloosa. In June, 1973 Thomson purchased Dr. Shaw's stock so that the ownership of Bio-Lab was divided as follows: Morad, 42%; Thomson, 28%; Coupounas, 30%. Several months later Coupounas and Dr. Shaw were removed from the board of directors and replaced by Morad's wife, Pamela, and two other individuals.
In February, 1974, Morad, his wife, and Thomson incorporated another plasmapheresis business, Med-Lab, Inc., that began operating in Tuscaloosa in September of 1974. Since that time, Morad has served as president of both Bio-Lab and Med-Lab, working "full-time" for both corporations, according to the corporate tax returns. Both corporations are profitable. Morad's own testimony at trial revealed that Bio-Lab had lost donors to Med-Lab and that the two corporations sold 95% of their products to the same three biological manufacturing corporations. Morad also testified that he jointly purchases insurance policies and supplies for Bio-Lab and Med-Lab, and uses the car supplied him by Bio-Lab on Med-Lab business. Orders for plasma received by Bio-Lab are sometimes filled by Med-Lab.
In May, 1976, Coupounas, eliminated from any interest in the Tuscaloosa venture, filed suit individually, and for the benefit of Bio-Lab, against Med-Lab, Morad, Morad's wife, and Thomson alleging a breach of fiduciary duty to Bio-Lab in the formation of Med-Lab. The complaint asked that a constructive trust be imposed on Med-Lab in favor of Bio-Lab, or alternatively, that defendants be required to offer Coupounas the same percentage of ownership in Med-Lab as he held in Bio-Lab, i.e., 30%. The trial court, hearing extensive testimony without a jury, rendered judgment for Coupounas and ordered the defendants to offer him 30% of the stock of Med-Lab.
In Lagarde v. Anniston Lime Stone Co., 126 Ala. 496,28 So. 199 (1899), this Court first formulated its doctrine of corporate opportunity. There it was stated:
 "It is well settled that directors and other governing members of a corporation are so far agents of the corporation that in their dealings respecting corporate interests, they are subject to the rules which apply generally to persons standing in fiduciary relations and which forbid such persons to secure an advantage for themselves which fidelity to the trust reposed in them would carry to others whose interests they ought to represent.
* * * * * *
 "[I]n general the legal restrictions which rest upon such officers in their acquisitions are generally limited to property wherein the corporation has an interest already existing, or in which it has an expectancy growing out of an existing right, or to cases where the officers' interference will in some degree balk the corporation in effecting the purposes of its creation."
See also Cox Perry, Inc. v. Perry, 334 So.2d 867 (Ala. 1976). The last restriction in Lagarde, that which prohibits "balking the corporate purpose," is really quite broad in its formulation, although the case has often been described as restrictive. See e.g., Note, Corporate Opportunity, 74 Harv.L. Rev. 765 (1961). We think that Lagarde when properly read establishes responsibilities for the corporate officer or director comparable to those outlined Guth v. Loft, Inc.,23 Del. Ch. 255, 5 A.2d 503 (1939), where the Delaware Supreme Court employed the doctrine of corporate opportunity and observed that it
 ". . . demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from *Page 9 
doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale."
Moreover, the Delaware Supreme Court stated in more practical terms what the law demands of corporate officers or directors:
 "[I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself."
We think that this passage provides a workable definition of "balking the corporate purpose." To this definition must be added the caveat that whether or not an officer has misappropriated a corporate opportunity and thereby balked the corporate purpose does not depend on any single factor. On the contrary,
 "[n]umerous factors are to be weighed, including the manner in which the offer was communicated to the officer; the good faith of the officer; the use of corporate assets to acquire the opportunity; the financial ability of the corporation to acquire the opportunity; the degree of disclosure made to the corporation; the action taken by the corporation with reference thereto; and the need or interest of the corporation in the opportunity. These, as well as numerous other factors, are weighed in a given case. The presence or absence of any single factor is not determinative of the issue of corporate opportunity." Paulman v. Kritzer, 74 Ill. App.2d 284, 219 N.E.2d 541
(1966).
Necessarily, such a question is one of fact and the decisions of the trial court hearing the evidence ore tenus will not be disturbed on appeal unless plainly erroneous or manifestly unjust. Lipscomb v. Tucker, 294 Ala. 246, 314 So.2d 840 (1975); see also Equity Corp. v. Milton, 221 A.2d 439 (Del. 1966);Tower Recreation, Inc. v. Beard, 231 N.E.2d 154 (Ind.App. 1967). Here the trial court specifically found that one of the corporate purposes of Bio-Lab was to expand into specific new areas, including Tuscaloosa. Ample evidence in the record supports this conclusion. Bio-Lab's certificate of incorporation declared that one of the purposes of the business was "to have one or more offices." While this open-ended, boilerplate language standing alone might not be sufficient to support the trial court's findings, testimony and exhibits produced at trial show that expansion to Tuscaloosa was anticipated for Bio-Lab's future.
As pointed out above, one of the factors to be considered by the trial court is the corporation's financial ability to undertake the new enterprise, although financial ability must be carefully considered and will not necessarily be determinative. As observed in Paulman v. Kritzer,
 "The inherent dangers of permitting a corporate officer or director to seize upon an opportunity on the grounds that the corporation is financially unable to do so, at a time when the corporation is solvent, is recognized in Irving Trust Co. v. Deutsch, 73 F.2d 121, at page 124 (C.A.2, 1934) where the court stated:
 "`If directors are permitted to justify their conduct on such a theory, there will be a temptation to refrain from exerting their strongest efforts on behalf of the corporation since, if it does not meet the obligations, an opportunity of profit will be open to them personally.'"
Testimony on the issue of financial ability was given at trial by Herbert Raburn, *Page 10 
a certified public accountant, familiar with the books of both Bio-Lab and Med-Lab. Counsel for Morad sought to have Raburn testify that Bio-Lab could not have obtained a loan to finance expansion to Tuscaloosa. In fact, no one had ever sought a loan for this purpose. Because no loan had been sought, the trial court refused to allow Raburn to testify on this point, and observed that any testimony on what a particular bank would do, would be, under the circumstances, highly speculative. We agree. Raburn admitted that he knew only "in general terms" what banks look for in making loans. Consequently, he was not qualified to testify whether or not Bio-Lab could have gotten a loan.
Furthermore, Raburn's testimony revealed that $44,000 had been required to establish Med-Lab. At the end of 1974 Bio-Lab had only $24,300 available for this purpose. But, Raburn also testified that in 1974 Bio-Lab had paid a "rather high" dividend of $20,000. His testimony indicated that the payment of dividends is often restricted when a corporation wishes to expand. Thus, if the dividend had not been paid, Bio-Lab clearly should have had the financial ability to expand to Tuscaloosa, with or without a loan. In light of this testimony the trial court's finding that defendants improperly formed Med-Lab to the detriment of Bio-Lab is clearly supportable and will not be disturbed by this Court on appeal.
We do not, however, feel that the trial court was justified in ordering defendants to offer 30% of Med-Lab's stock to Coupounas. The traditional remedy in cases of this sort is a constructive trust imposed for the benefit of the corporation. See e.g. McKinstry v. Thomas, 258 Ala. 690, 64 So.2d 808
(1953); Guth v. Loft, Inc., 23 Del. Ch. 255, 5 A.2d 503 (1939);Legarde v. Anniston Lime Stone Co., 126 Ala. 496, 28 So. 199
(1899). In McKinstry a constructive trust was precluded because the corporation had been dissolved. But no such justification exists for the remedy imposed here. One purpose for preserving the use of a constructive trust in this sort of situation is to avoid forcing individuals into business together under strained circumstances. Such a situation would only be counterproductive. The policy underlying the use of a constructive trust is well illustrated by this case. Coupounas and defendants were not getting along prior to the formation of Med-Lab. It is hardly likely that their relations have improved through the course of this lawsuit. While the courts should strive to place the parties in their proper financial positions, they should not force individuals into business arrangements they clearly do not want. Here, a constructive trust for the benefit of Bio-Lab was the appropriate remedy.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
TORBERT, C.J., and BLOODWORTH, ALMON and EMBRY, JJ., concur.