MENDHEIM, Justice.
Aqua Marine Enterprises, Inc. ("AME"), and Brent Mitchell appeal from a judgment of the Morgan Circuit Court in favor of K & B Fabricators, Inc. ("K & B"), following a bench trial in a dispute alleging the usurpation of corporate opportunities in the business of fabricating storm shelters. We affirm in part and reverse in part the judgment of the trial court and remand the case.
I. Facts
Brent Mitchell is, according to his own affidavit in this case, the chief operating officer for AME, and he is also its vice president. Mitchell testified that he is "the day-to-day operations ... guy" for AME. AME is an Alabama closely held corporation with four shareholders who each own 25 percent of AME's stock. AME's shareholders are Mitchell, his wife, his father, and his mother. According to Mitchell, AME was incorporated in 1988 and entered the business of selling storm shelters in 1995 under the trade name Safe-T-Shelter. AME carries on other business not related to storm shelters, the nature of which is not specified in the record.
Storm shelters are structures fabricated from raw steel that are designed to withstand high winds and flying debris typical of tornadoes and hurricanes. There are two general types of storm shelters: community shelters and residential shelters. Community shelters are large structures designed to hold many people; they contain lights and fans and are installed outdoors beneath an earthen berm. Community shelters are typically purchased by cities, counties, or even the Federal Emergency Management Agency ("FEMA"), and contracts *254 to build community shelters generally go through a public-bidding process. Eligibility to sell and install community shelters requires three licenses: a retail license, a manufacturing license, and an installation license. AME has all three licenses; K & B has never had such licenses. The steel residential shelters are smaller structures installed inside houses and bolted to the concrete foundation in new homes or installed in a garage, workshop, or carport in existing homes. These residential shelters ordinarily do not contain lights or fans, and no licensing is required to install them.
Fabricating storm shelters involves taking raw steel and cutting and welding it into the shape and structure of a storm shelter. When AME began selling storm shelters in 1995, it did not fabricate them. Instead, it used an Ohio-based company, HB Products, to fabricate the shelters, which AME would then install.
In 2006, Mitchell began discussions with Kendall Blaxton, who owned a welding-supply company used by AME, about starting a storm-shelter-fabrication business in Alabama because Mitchell believed it would be more efficient to deal with a local shelter fabricator. Those discussions led to the formation of K & B, a closely held corporation with three shareholders, in 2006. Those shareholders were brothers Kenneth Blaxton and Kendall Blaxton, who each owned 45 percent of K & B's stock, and Mitchell, who owned 10 percent of its stock. K & B was incorporated on August 2, 2006.
The articles of incorporation for K & B show that the initial directors of K & B were Kenneth Blaxton, Kendall Blaxton, and Mitchell. Mitchell's signature appears on the articles of incorporation, along with those of the Blaxton brothers. Kendall Blaxton testified that the reason Mitchell wanted to be a shareholder and a director of K & B was so that K & B "would prioritize [AME's] work. If [K & B] went out and got any other work and it got in the way of [AME's] work, [Mitchell] didn't want that. So there was a gentleman's agreement that [K & B] take [AME's] work before anything else. So that's what we always did."
It is undisputed that from 2006 to mid 2014, all of AME's steel storm-shelter orders were fabricated by K & B. The testimony of several witnesses at trial indicated that the process for producing storm shelters between AME and K & B changed little over those years. AME obtained the customer orders for storm shelters, and AME would then order the fabrication of the shelters from K & B. From 2006 to late 2011, K & B would directly order the raw materials for the fabrication orders from AME's steel suppliers. From late 2011 through 2014, after Mitchell hired Sylaina Hinkle as AME's project manager for its storm-shelter business, AME purchased and ordered the raw materials for fabrication from AME's steel suppliers, which were then delivered directly to K & B. The raw materials consisted of steel, paint, and paint supplies. After K & B received the materials, it would fabricate a shelter according to the specifications in the order. K & B then delivered the fabricated shelter to AME, at which point AME would pay K & B for its fabrication work. If the order was for a community shelter, AME would then have an electrical company install wiring, lighting, and fans in the shelter. AME would then take the shelter to the customer's location for installation. If the order was for a residential shelter, AME would simply take the shelter to the customer's location for installation.
Kendall Blaxton testified that initially his brother, Kenneth, ran K & B's day-to-day operations. On July 5, 2006, AME entered into a "Non-competitive/Non-Disclosure/Non-Circumvention *255 Agreement" with "K & B Fabrication and Kenneth Blaxton" ("the noncompetition agreement"). Among other things, "K & B Fabrication" agreed that "during the term of this Agreement, it will not perform the same or similar services for itself or for any competitor of AME if such services performed are in any way related to design, development, manufacture, assembly, purchase and/or sale of similar items." The noncompetition agreement was signed by Mitchell as vice president of AME and by Kenneth Blaxton, though it did not specify in what capacity Kenneth signed the agreement.
Kendall Blaxton testified that in 2009 he and his brother had a dispute about how K & B was being managed, and Kendall ended up buying out Kenneth's ownership interest in K & B. Kendall Blaxton (hereinafter "Blaxton") then owned 90 percent of K & B's stock and Mitchell owned 10 percent. From that point, Blaxton, along with K & B's fabrication-shop foreman, Joel Carroll, began running the day-to-day operations of K & B.
Blaxton testified that, despite being a shareholder and director in K & B, Mitchell "never wanted any money out of K & B. He said that many, many times. He just wanted [K & B] to give his business top priority, which we always did." As a result, Mitchell never received any distributions from K & B. Mitchell did not directly dispute this testimony. Blaxton testified that, during a month in 2013, he was not going to be able to make payroll for K & B employees and, therefore, he came to Mitchell for a loan. Mitchell gave Blaxton $20,000 to meet the payroll, but instead of requesting repayment of the loan, he requested more stock in K & B. Consequently, Mitchell received 15 percent more of the stock in K & B in exchange for the $20,000, bringing Mitchell's total ownership interest in K & B to 25 percent, while Blaxton owned 75 percent.
Both Mitchell and Blaxton testified that between 2006 and early 2011 AME and K & B's storm-shelter-business activity was slow. In 2011, however, the southeastern United States experienced a large number of tornadoes, and AME's storm-shelter orders and K & B's fabrication business dramatically increased. Blaxton testified that K & B's employment situation "went from seven or eight people in [20]11 to[,] in [20]13[,] 29 people working strictly for [AME's]" business.
In early 2012, Blaxton formed Compliance Construction ("Compliance") with Roy Woods and Joel Carroll. Blaxton and Carroll both testified that Compliance was conceived to take advantage of business opportunities that did not involve storm-shelter fabrication. Blaxton rented a building adjacent to the two buildings K & B rented for its work as Compliance's place of business. Blaxton testified that his business relationship with Woods was short-lived but that Carroll then became a one-half owner in Compliance with him.
The facts are in dispute concerning what led to the breakdown in relations between AME and K & B. According to Blaxton, in March 2014 Mitchell came to him and asked how much it would cost for AME to buy K & B. Blaxton told Mitchell he would take $1,500,000. Mitchell rejected the price. A few weeks later, Blaxton asked Mitchell what price he had in mind for purchasing K & B. Mitchell offered $900,000. Blaxton told him to add $100,000 to the price and they would have a deal. According to Blaxton, Mitchell agreed to the purchase price and asked to see K & B's financial records, which Blaxton stated he provided. Blaxton testified that he never heard anything more from Mitchell regarding the purchase of K & B. Instead, in May 2014, AME unilaterally changed its *256 payment schedule to K & B. Rather than paying K & B immediately upon delivery of a shelter, AME stated that it would pay K & B 30 days after delivery. Blaxton told Hinkle that this arrangement was unacceptable and that the payment delay could be no more than 20 days. Blaxton testified that AME eventually agreed to 20 days but that he decided K & B's business with AME needed to change further because K & B had not raised its fabrication prices from 2006 to 2014. Accordingly, Blaxton sent Mitchell an e-mail demanding that K & B be the one to order raw materials for residential shelters and increasing the price for the fabrication of such shelters. He received no response from AME. Soon thereafter, in June 2014, Carroll came to Blaxton and informed him that on several occasions AME employees' Hinkle and Dennis Weaver had approached him and attempted to persuade him to leave K & B and come work for AME in a fabrication facility AME was going to build. According to Blaxton, around the same time AME stopped sending K & B storm-shelter orders.
According to Mitchell, he first inquired about buying K & B in November or December 2013, and Blaxton renewed the conversation in March 2014. Mitchell agreed that the discussed purchase price was $1,000,000, but he stated that he never received sufficient financial information from Blaxton to make him feel comfortable about the purchase. Mitchell testified that, when he received the e-mail from Blaxton detailing a price increase from K & B for the fabrication of residential shelters, he mulled over whether to accept the price increase. Mitchell stated that he was still thinking about the proposal when K & B sued AME and Mitchell on June 25, 2014. At that point, according to Mitchell, he instructed Hinkle to stop dealing with K & B.
Hinkle testified that, in early July 2014, Mitchell began scouting potential sites for AME to build its own fabrication facility. In the meantime, in order to fulfill storm-shelter orders AME had already received, it engaged HB Products in Ohio to fabricate some orders. According to Dennis Weaver, AME's fabrication-facility manager, Mitchell made the decision to have AME start fabricating storm shelters itself. He stated that AME purchased a facility in July 2014, made preparations for opening the facility in August, and began fabricating community shelters in its facility in September 2014. Weaver further stated that AME did not begin fabricating residential shelters until 2015. Mitchell testified that AME fabricated 35 community shelters in 2014, 57 community shelters in 2015, and 26 community shelters up to the time of trial in 2016. Mitchell did not know how many residential shelters AME fabricated in 2015 or 2016, and no figures concerning the fabrication of residential shelters were introduced during the trial. Mitchell, Hinkle, and Weaver all confirmed that several former K & B employees went to work for AME when it began fabricating storm shelters. Mitchell stated that, when AME contacted those employees about employment with AME, they were not working for K & B.
Carroll testified that in May 2014 he fabricated a residential storm shelter on his own time and transported it to Texas Tech University to have it tested to see if it met FEMA's wind-threshold requirements. Both Carroll and Blaxton testified that Carroll did this without Blaxton's knowledge. Carroll stated that he built the test shelter with the idea that Compliance could go into the residential storm-shelter business.
Blaxton testified that, after AME stopped providing storm-shelter orders to K & B, K & B's fabrication business disappeared.
*257 He stated that K & B has not done business of any kind since that time. He also stated that in July 2014 K & B sold its fabrication tools and equipment to Compliance. According to Carroll, Compliance started building residential storm shelters in August 2014. Later, following discussions between Blaxton and Carroll, Compliance also began building community storm shelters.
Mitchell testified at trial that he was still a director of K & B and that he was aware that, "as a member of the board of directors of K & B[, he] owed a fiduciary duty to K & B."
On June 25, 2014, K & B sued AME and Mitchell in the Morgan Circuit Court, asserting that AME was "in the process of establishing an independent manufacturing company to manufacture steel shelters, which will directly compete with K & B Fabricators." On August 20, 2014, K & B filed an amended complaint asserting that AME had "established an independent manufacturing company to manufacture steel shelters" in competition with K & B. The amended complaint contained 13 counts, some against Mitchell individually, some against AME, and some against both defendants.
Only four of the counts in the amended complaint (counts II, III, XI, and XII) are pertinent to our review. In count II of the amended complaint, alleging breach of fiduciary duty against Mitchell, K & B alleged the following:
"22. Brent Mitchell as a shareholder of K & B Fabricators, owed a fiduciary duty of loyalty that precludes him from usurping corporate opportunities of K & B Fabricators.
"23. Brent Mitchell deprived K & B Fabricators of and did usurp and misappropriate corporate opportunities for the benefit of himself and/or [AME] by purchasing products from competitors of K & B Fabricators and reselling to customers of his and/or [AME], and by refusing to sell any K & B Fabricators shelters.
"24. Brent Mitchell has further undertaken to deprive K & B Fabricators of corporate opportunities on an ongoing basis by attempting to establish an independent manufacturing company that would compete directly with K & B Fabricators.
"WHEREFORE, K & B Fabricators demands judgment against Brent Mitchell for compensatory damages in an amount to be determined by the trier of fact, punitive damages in an amount to be determined by the trier of fact, an order declaring that Brent Mitchell should retain and hold all profits derived from misappropriation of K & B Fabricators' corporate opportunities in a constructive trust for the benefit of K & B Fabricators, a preliminary injunction, and a permanent injunction requiring Brent Mitchell to refrain from competing with K & B Fabricators, costs of suit herein incurred, attorneys' fees, and such other and further relief as the Court may deem proper."
Similarly, in count III of the amended complaint, also alleging breach of fiduciary duty against Mitchell, K & B alleged, in part, that "Mitchell, as a shareholder of K & B Fabricators, owed a fiduciary duty of loyalty that precludes him from harming the profitability of K & B Fabricators or attempting to hire its employees to work for competing businesses," but that "Mitchell breached his fiduciary duty by contacting a key employee of K & B Fabricators, Joel Carroll, and repeatedly attempting to convince Carroll to leave K & B Fabricators and work for [AME] and/or the new manufacturing concern of [AME] in direct competition with K & B Fabricators."
*258 In counts XI and XII of the amended complaint, alleging breach of contract and unjust enrichment, respectively, against AME, K & B sought damages based on unpaid invoices for completed fabrication services.
On July 25, 2014, AME and Mitchell filed a joint answer to the complaint and asserted two counterclaims. The first counterclaim asserted that K & B had violated the noncompetition agreement by going into competition with AME and using AME's confidential information to do so. The second counterclaim observed that Mitchell is a minority shareholder in K & B and that Blaxton is K & B's majority shareholder and its president. The second counterclaim asserted that Blaxton had breached his fiduciary duty to K & B by forming Compliance to go into the business of fabricating storm shelters "in direct competition with K & B" and by failing to make any distributions to Mitchell as a minority shareholder in K & B.
On October 25, 2015, AME and Mitchell filed a joint motion for a summary judgment on K & B's amended complaint with respect to all counts except counts XI and XII. In its response, K & B opposed a summary judgment with respect to counts II and III of its amended complaint, i.e., its claims against Mitchell alleging breach of fiduciary duty and misappropriation of corporate opportunities.
On March 22, 2016, the trial court entered a partial summary judgment in favor of AME and Mitchell. Specifically, the trial court entered a summary judgment on all of K & B's contested counts against Mitchell except counts II and III, which, the trial court stated, "stem from the fiduciary duties Defendant Brent Mitchell owed to Plaintiff K & B Fabricators as a corporate director." The action proceeded to a bench trial regarding counts II, III, XI, and XII of K & B's amended complaint, as well as AME and Mitchell's counterclaims. At trial, the trial court heard testimony from several witnesses, including Blaxton, Carroll, Hinkle, Weaver, and Mitchell.
In its posttrial brief, K & B asserted that it was seeking damages of $531,000 on counts II and III "for appropriation of the corporate opportunity of fabricating ... community shelters" by AME in the years 2014, 2015, and 2016. It also sought "the imposition of a constructive trust for all future profits derived from such appropriation."[1]
On April 28, 2017, the trial court entered an order in which it concluded:
"Pursuant to an agreement between K & B and [AME], K & B was the exclusive manufacturer of storm and community shelters for [AME].... Defendant Mitchell breached his fiduciary duties to K & B by usurping and misappropriating a corporate opportunity of K & B by diverting the storm and community shelter manufacturing business away from K & B and to [AME]. K & B was damaged and lost profits as a direct consequence of this breach of fiduciary duties and misappropriation of corporate opportunity.
"....
"... As to Counts [II] and [III] of [K & B's] First Amended Complaint for breach of fiduciary duty against Defendant Brent Mitchell, judgment is entered in favor of K & B and against Defendant Brent Mitchell for compensatory damages in the amount of $531,000. A constructive trust is imposed upon the profits of Defendant [AME] earned through the sale of community and/or *259 storm shelters in favor of K & B Fabricators as follows:
"1. The profits of [AME] earned through the sale of community ... storm shelters for years 2014, 2015, and 2016, an amount shown at trial to be $531,000, are immediately payable over to K & B upon its demand; and
"2. the profits of [AME] earned through the sale of community ... storm shelters for all years after 2016 are payable over to K & B Fabricators upon its demand; and
"3. to insure the protection of K & B Fabricators, K & B Fabricators shall have the right regularly to inspect the books and records of [AME] to insure that all profits or income [AME] earned through the sale of community ... storm shelters are properly declared and paid over upon demand; and
"4. the Court will maintain its continuing equitable jurisdiction over this cause to insure that the community ... storm shelter profits of [AME] properly inure to K & B Fabricators' benefit."
Additionally, the trial court awarded K & B $137,680 on K & B's breach-of-contract claim (count XI) based on unpaid invoices. It ruled in favor of AME on K & B's unjust-enrichment claim (count XII). With regard to AME and Mitchell's counterclaims, the trial court concluded that "K & B did not violate any non-competition or confidentiality agreement it may have had with [AME]," but it ordered Blaxton to pay Mitchell $25,000 for breach of fiduciary duty.
On May 19, 2017, AME and Mitchell filed a motion to alter, amend, or vacate the trial court's judgment in which they contended that the trial court erred in finding that AME and K & B had an exclusive agreement to fabricate storm shelters because the court had previously entered a summary judgment in the defendants' favor on K & B's claims alleging the existence of such an agreement. They argued that, without such an agreement, "there can be no loss of any enforceable right that Defendant [AME] continue to have [K & B] manufacture its storm and community shelters." They also contended that the trial court incorrectly imposed a constructive trust upon AME's profits even though "the Court's holding is based upon alleged breach of fiduciary duty by individual Defendant, Brent Mitchell."
On August 31, 2017, the trial court entered an order in which it granted in part and denied in part AME and Mitchell's postjudgment motion. The trial court agreed with AME and Mitchell that no exclusive agreement to fabricate shelters existed between AME and K & B, but it still concluded that, "as a matter of law, Defendant Brent Mitchell owed K & B Fabricators, Inc., a fiduciary duty as a director and that duty was breached." The trial court further found that, even though K & B had not asked for a constructive trust to be imposed specifically against AME, a constructive trust is an equitable remedy imposed by the court that does not have to be pleaded. It reiterated that the constructive trust in this case was "an appropriate remedy" because Mitchell had breached his duty of loyalty to K & B by "usurp[ing] corporate opportunities to his own benefit." The trial court also clarified its previous order by stating that the "[constructive] trust should be limited to profits from fabrication work, not total profits."
AME and Mitchell appeal.
II. Standard of Review
AME and Mitchell contend that a de novo standard of review applies because "any facts that were in dispute at trial are immaterial to the issues on appeal. Rather, the trial court's error lies in *260 its application of the law to undisputed facts and its misunderstanding of black-letter law." AME and Mitchell's brief, p. 22. This is simply not the case. The trial court's determination that Mitchell breached a fiduciary duty to K & B is laden with factual conclusions, including (to list just two examples) whether Mitchell made the decision that AME would start its own fabrication business and whether that decision constituted the usurpation or misappropriation of a corporate opportunity belonging to K & B. See Morad v. Coupounas, 361 So.2d 6, 9 (Ala. 1978) (stating that the question "whether or not an officer has misappropriated a corporate opportunity" is "[n]ecessarily ... one of fact and the decisions of the trial court hearing the evidence ore tenus will not be disturbed on appeal unless plainly erroneous and manifestly unjust"). Therefore, the standard of review is the traditional one for an appeal from a bench trial.
"Because the trial court heard ore tenus evidence during the bench trial, the ore tenus standard of review applies. Our ore tenus standard of review is well settled. ' "When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error." ' Smith v. Muchia, 854 So.2d 85, 92 (Ala. 2003) (quoting Allstate Ins. Co. v. Skelton, 675 So.2d 377, 379 (Ala. 1996) ).
" '....'
"... However, 'that presumption [of correctness] has no application when the trial court is shown to have improperly applied the law to the facts.' Ex parte Board of Zoning Adjustment of Mobile, 636 So.2d 415, 417 (Ala. 1994)."
Kennedy v. Boles Invs., Inc., 53 So.3d 60, 67-68 (Ala. 2010).
III. Analysis
AME and Mitchell take issue with the trial court's determination of liability and its assessment of damages on counts II and III of K & B's amended complaint concerning a breach of fiduciary duty and the misappropriation of corporate opportunities. AME also takes issue with the trial court's denial of its counterclaim alleging that K & B violated the noncompetition agreement. AME has not challenged the trial court's judgment with respect to K & B's breach-of-contract claim based on unpaid invoices.
A. K & B's Claims of Misappropriation of Corporate Opportunities
1. Mitchell's Fiduciary Duty to K & B
AME and Mitchell begin by contending that there was no loss of corporate opportunities in this case and that, therefore, there could be no breach of fiduciary duty by Mitchell against K & B. This is so, they say, because the corporate-opportunity doctrine is concerned with the deprivation of new business opportunities that did not exist before the corporate officer had a relationship with the corporation. As AME and Mitchell put it:
"There is no basis for liability because [AME's] fabrication business predated K & B by at least 11 years. [AME's] fabrication business was not a venture created for K & B's benefit but an ongoing part of its business, which it decided to sub out to K & B. Without an exclusive contract, K & B had no interest in [AME's] fabrication work."
AME and Mitchell's brief, p. 29. Assessing this argument requires an examination of the corporate-opportunity doctrine.
"The corporate fiduciary duty is divided into two parts: (1) a duty of care; and (2) a duty of loyalty.... The corporate *261 opportunity doctrine is one aspect of the duty of loyalty." Massey v. Disc Mfg., Inc., 601 So.2d 449, 456 (Ala. 1992).
"The duty is only co-extensive with the trust, so that in general the legal restrictions which rest upon such officers in their acquisitions are generally limited to property wherein the corporation has an interest already existing, or in which it has an expectancy growing out of an existing right, or to cases where the officers' interference will in some degree balk the corporation in effecting the purposes of its creation."
Lagarde v. Anniston Lime & Stone Co., 126 Ala. 496, 502, 28 So. 199, 201 (1900).
"The last restriction in Lagarde, that which prohibits 'balking the corporate purpose,' is really quite broad in its formulation, although the case has often been described as restrictive. See e.g., Note, Corporate Opportunity, 74 Harv. L. Rev. 765 (1961). We think that Lagarde when properly read establishes responsibilities for the corporate officer or director comparable to those outlined Guth v. Loft, Inc., 23 Del. Ch. 255, 5 A.2d 503 (1939), where the Delaware Supreme Court employed the doctrine of corporate opportunity and observed that it
" '... demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The occasions for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale.'
"Moreover, the Delaware Supreme Court stated in more practical terms what the law demands of corporate officers or directors:
" '[I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.'
"We think that this passage provides a workable definition of 'balking the corporate purpose.' "
Morad, 361 So.2d at 8-9.
AME and Mitchell's argument essentially is that AME has been in the storm-shelter business since 1995 and K & B was not incorporated until 2006, so AME merely continued its own business when it stopped providing fabrication orders to K & B; it did not, they assert, appropriate a corporate opportunity belonging to K & B. In other words, AME and Mitchell insist that fabricating storm shelters is not a distinct business opportunity that could be appropriated; instead, they assert, it constitutes a segment of AME's storm-shelter business.
AME and Mitchell take this position despite the fact that for almost 20 years *262 AME used other businesses to fabricate the storm shelters it installed. It is undisputed that AME never entered the fabrication business until mid 2014. Before that time, AME had always paid other businesses to fabricate the storm shelters it installed. Indeed, Mitchell testified that before 2014 AME "didn't have any experience in fabrication" and that AME's start-up costs for beginning that enterprise totaled $800,000. Thus, the evidence supports the conclusion that AME's fabrication business was a distinct corporate opportunity that did not predate the incorporation of K & B.
AME and Mitchell argue that, even if steel fabrication is a corporate opportunity, it is not one that belonged to K & B because AME did not have an exclusive agreement to provide fabrication orders to only K & B. It is undisputed that, from 2006 to mid 2014, AME placed fabrication orders solely with one corporation: K & B. It is also undisputed, however, that, even though the business arrangement was exclusive in practice, no written agreement existed binding AME to K & B for its fabrication services.
AME and Mitchell are correct that the lack of a contract between the parties ordinarily would mean that K & B had no expectation of a continued relationship with AME. However, this is not an ordinary case because Mitchell, an owner and officer of AME, is also a director of K & B. As Mitchell acknowledged at trial, this means he owes a duty of loyalty to K & B.
The authorities quoted above make clear that, in practice, this duty of loyalty means that Mitchell must " 'not only affirmatively ... protect the interests of [K & B], but also ... refrain from doing anything that would work injury to [K & B], or ... deprive it of profit or advantage which his skill and ability might properly bring to it,' " Morad, 361 So.2d at 8-9, or "in some degree balk [K & B] in effecting the purposes of its creation." Lagarde, 126 Ala. at 502, 28 So. at 201. As a director of K & B, Mitchell was aware that from its inception K & B received all of its fabrication business from AME. See Banks v. Bryant, 497 So.2d 460, 464 (Ala. 1986) (observing that " '[t]his corporate right or expectancy, this mandate upon directors to act for the corporation, may arise from various circumstances; such as, for example, the fact that ... the corporation was in need of the particular business opportunity to the knowledge of the directors' " (quoting 3 W. Fletcher, Cyclopedia of the Law of Private Corporations, § 861.1, at p. 208 (perm. ed. 1975) ) ). As a K & B director, Mitchell had a duty to sustain that business relationship with AME. Indeed, trial testimony revealed that Mitchell sought to be a director and shareholder in K & B precisely because he wanted K & B to prioritize its business with AME above any other opportunities it might have procured. Thus, fabrication orders from AME clearly were a corporate opportunity for K & B, an opportunity that was " 'in the line of [K & B's] business and is of practical advantage to it, ... one in which [K & B] ha[d] an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of [Mitchell was] brought into conflict with that of [K & B].' " Morad, 361 So.2d at 9.
AME and Mitchell reiterate that "[AME's] fabrication was never K & B's opportunity because it was [AME's] business all along." AME and Mitchell's brief, p. 31. But the only way the opportunity to fabricate could belong to AME is if AME already had the capacity to fabricate storm shelters before it ceased dealing with K & B. It is undisputed that AME had no such capacity; fabricating the shelters was not a corporate opportunity for AME until Mitchell made the decision to have AME
*263 compete in that line of business with K & B.
AME and Mitchell also contend that "K & B abandoned [AME's] fabrication business before [AME] took any action to move it in house." AME and Mitchell's brief, p. 33. For this argument, AME and Mitchell cite Blaxton's decision in May 2014 demanding an increase in the prices for fabricating residential shelters and K & B's subsequent decision to sue AME and Mitchell, both of which occurred "before [AME] took any steps to switch fabricators." Id. at 34.
AME and Mitchell's argument reflects one possible interpretation of the facts presented at trial, but there is also evidence to support the view that Mitchell took steps toward ending AME's relationship with K & B and having AME start its own fabrication business as soon as he determined that it did not make financial sense for AME to purchase K & B. It was AME that initiated the first proposed change in the business relationship between AME and K & B in the spring of 2014, when AME proposed to pay K & B 30 days after K & B delivered a shelter rather than immediately after delivery -- the latter of which had been the practice since 2006. Blaxton's decision to raise K & B's fabrication prices for residential shelters did not occur until after AME's proposed change in the business relationship. There also is evidence indicating that Mitchell and AME employees sought to poach Joel Carroll's services from K & B for AME's new fabrication business before K & B filed its lawsuit. Moreover, evidence at trial supported the allegation in K & B's amended complaint that in June 2014 AME was "in the process of establishing an independent manufacturing company to manufacture steel shelters." Thus, evidence in the record supports the view that AME's actions, rather than K & B's, led to the demise of the business relationship. The trial court obviously concluded that the record did not support AME and Mitchell's argument in this regard, and we do not believe the trial court committed plain or palpable error in reaching this conclusion.
AME and Mitchell also argue that "Mitchell's fiduciary duty to K & B did not require him to promote K & B's interests to the detriment of [AME]." AME and Mitchell's brief, p. 35. AME and Mitchell repeatedly draw attention to the fact that Mitchell also had a duty of loyalty to AME because he was AME's vice president and chief operating officer. In this regard, they attempt to portray Alabama law as including the principle that Mitchell had a stronger fiduciary duty to AME than he did to K & B. See AME and Mitchell's brief, pp. 35-37. This is so, they say, because K & B knew from the outset that Mitchell's primary concern was for the financial welfare of AME, not K & B. According to AME and Mitchell, the trial court's judgment puts Mitchell in the untenable position of favoring K & B's business interests over those of AME.
There are multiple problems with this argument. First, the only Alabama authority AME and Mitchell have cited for the proposition that the fiduciary duty Mitchell owed K & B was judged on a "low fiduciary standard" in comparison to the duty of loyalty he owed AME does not support that proposition.[2] But, in a context roughly analogous to Mitchell's situation, in which the defendant was an owner and controlling *264 director in one corporation and a trustee in a second corporation, this Court has stated: "[W]hen faced with a situation such as that presented in this case, in which the fiduciary has overlapping obligations as both a director and a trustee sharing a common interest, the law imposes a special duty on the fiduciary to deal fairly with both sides." Jones v. Ellis, 551 So.2d 396, 403 (Ala. 1989). Moreover, Delaware law, which this Court has looked to for explicating the law of corporate opportunity, similarly holds that
"[t]here is no 'safe harbor' for such divided loyalties .... When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain. [Citations omitted.] The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts."
Weinberger v. UOP, Inc., 457 A.2d 701, 710-11 (Del. 1983). When Mitchell became aware of an opportunity to fabricate storm shelters, he did not have the legal luxury of maintaining his duty of loyalty to AME at the expense of that same duty to K & B merely because he had a more direct role in AME. One way Mitchell could have resolved any potential conflict between his duty to AME and his duty to K & B would have been to resign as a director of K & B. As the record indicates, he never did so.
Furthermore, this argument misunderstands Mitchell's duty of loyalty in the context of a corporate opportunity. The problem with Mitchell's actions is not simply that he directed AME to start a competing fabrication business but that in doing so he knowingly destroyed K & B's business -- a business of which he also was a director.
" 'When acting in good faith, a director or officer is not precluded from engaging in distinct enterprises of the same general class of business as the corporation is engaged in; but he may not wrongfully use the corporation's resources therein, nor may he enter into an opposition business of such a nature as to cripple or injure the corporation.' "
Banks, 497 So.2d at 462-63 (quoting 19 C.J.S. Corporations § 785 (1940) (emphasis omitted; emphasis added) ). See, e.g., Cox & Perry, Inc. v. Perry, 334 So.2d 867, 869 (Ala. 1976) (concluding that directors' new business did not violate the doctrine of corporate opportunity because it did not thwart the purpose of the plaintiff corporation); Lagarde, 126 Ala. at 502, 28 So. at 201 (noting that the duty of loyalty is "generally limited ... to cases where the officers' interference will in some degree balk the corporation in effecting the purposes of its creation"). As noted above, as a practical matter, Mitchell controlled AME.[3] But Mitchell's duty of loyalty did not require Mitchell to give AME's fabrication orders to K & B regardless of cost. "The corporate-opportunity doctrine is invoked *265 when a director or officer appropriates for personal benefit a business opportunity that belongs to or should have been offered to the corporation." Davis v. Dorsey, 495 F.Supp.2d 1162, 1170 (M.D. Ala. 2007) (emphasis added). Mitchell's duty to K & B required him to offer the fabrication orders to K & B. If K & B proved incapable of taking advantage of the offer because another business (such as HB Products or AME's new fabrication business) could fabricate the shelter at issue for a lower price, then K & B would have no claim of misappropriation of corporate opportunity because Mitchell could not have been said to be "balking" K & B's purpose as a corporation. Instead, Mitchell consciously caused AME to stop dealing with K & B and to complete fabrication orders itself, to the benefit of Mitchell and his family. See, generally, Richard A. Thigpen, Alabama Corporation Law § 10:14 (4th ed. 2012) (stating that "[a]n understandable breach of loyalty occurs when an insider appropriates a business opportunity belonging to the corporation for his personal benefit").
Based on the foregoing, we conclude that the trial court did not err in concluding that Mitchell violated his duty of loyalty to K & B.
2. The Imposition of a Constructive Trust and the Damages Award
AME and Mitchell also argue that, even if Mitchell breached a fiduciary duty to K & B, the trial court erred by entering a judgment against AME on the count alleging that breach. AME and Mitchell note that, although the trial court entered the judgment on counts II and III "against Defendant Brent Mitchell," it further ordered that "[a] constructive trust is imposed upon the profits of Defendant [AME] earned through the sale of community ... storm shelters in favor of K & B Fabricators." AME and Mitchell point to what they deem to be several errors by the trial court with respect to this portion of its judgment.
First, AME and Mitchell contend that the judgment is procedurally improper because K & B did not plead a breach of fiduciary duty against AME and AME "never received notice that a constructive trust could be imposed on the corporation for Mitchell's individual breach until the trial court entered its judgment." AME and Mitchell's brief, p. 23. AME and Mitchell argue that this constitutes a violation of the constitutional due-process right of notice and opportunity to be heard. Second, as a substantive matter, AME and Mitchell argue that the constructive trust was improper because, they argue, AME owed no contractual or fiduciary duty to K & B and so it did nothing wrong. Third, AME and Mitchell contend that the damages award "makes no sense" because, even though the trial court "amended its original judgment to limit the constructive trust to 'profits from fabrication work, not total profits,' ... it did not change the judgment's dollar amount or indicate how fabrication profits could be calculated." AME and Mitchell's reply brief, p. 13. Furthermore, they insist that, at the least, the damages should be limited to Mitchell's share of AME's profits because the judgment is based on Mitchell's individual breach of a fiduciary duty. They note that the remaining stockholders in AME did not owe any such duty to K & B.
AME and Mitchell did not raise the issue of a constitutional due-process violation in the trial court. Instead, they merely contended that "[K & B] never requested a constructive trust, and the Court should not award things not requested by [K & B]." But K & B did request the imposition of a constructive trust in its amended complaint. Count II of the amended complaint *266 stated: "K & B Fabricators demands ... an order declaring that Brent Mitchell should retain and hold all profits derived from misappropriation of K & B Fabricators' corporate opportunities in a constructive trust for the benefit of K & B Fabricators ...." Given Mitchell's pivotal role in AME's business dealings and the fact that the amended complaint alleges that the competing business was started through AME, it is plausible to construe this request as one requesting a constructive trust as to AME's profits. Even if it is not so construed, as the trial court observed in its August 31, 2017, order, a constructive trust is an equitable remedy imposed by a court that need not be specially pleaded, so long as the facts are sufficient to impose such a trust. See, e.g., Radenhausen v. Doss, 819 So.2d 616, 620 (Ala. 2001) (noting that "a constructive trust is an equitable remedy; and a request to impose such a trust is not a cause of action that will stand independent of some wrongdoing"); Costell v. First Nat'l Bank of Mobile, 274 Ala. 606, 607, 150 So.2d 683, 684 (1963) (finding that, even though the plaintiff's complaint did not request the imposition of a constructive trust, "sufficient facts are alleged to show a constructive trust and the general prayer for relief was sufficient to justify the overruling of the general demurrer").
In arguing that AME owed K & B no fiduciary duty and that, because it did nothing wrong, no constructive trust can be imposed against AME, AME and Mitchell misunderstand the nature of a constructive trust.
"A constructive trust 'bears much the same relation to an express trust that a quasi contractual obligation bears to a contract.... [A]n obligation is imposed not because of the intention of the parties but to prevent unjust enrichment.' 3 Scott on Trusts § 462.1 (1939).
"Equity may impress a constructive trust on property in favor of one beneficially entitled thereto when another holds title to the property by fraud, commission of wrong, abuse of a confidential relationship, or any other form of unconscionable conduct. Keeton, Law of Trusts, 210 (5th ed. 1949); 4 Pomeroy, Equity Jurisprudence, § 1053 (5th ed. 1941); Walsh on Equity, § 106 (1930)....
"Equity may also impress a constructive trust on property in favor of one beneficially entitled thereto against a person, who, against the rules of equity and against good conscience, in any way either has obtained or holds and enjoys legal title to property that in justice that person ought not to hold and enjoy. 3 Scott on Trusts § 462.1 (1939); Restatement (Restitution) § 160, Comment A (1937).
" 'A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.'
" Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 122 N.E. 378, 380 (1919)."
American Family Care, Inc. v. Irwin, 571 So.2d 1053, 1058-59 (Ala. 1990). In short, a constructive trust is imposed when property is wrongfully acquired and held; the fact that the present holder of the property was not complicit in the wrongful acquisition will not necessarily prevent the imposition of a constructive trust.
This point is well illustrated in McKinstry v. Thomas, 258 Ala. 690, 64 So.2d 808 (1953), a case cited by the trial court and never addressed by AME and Mitchell. McKinstry concerned an action brought chiefly against T.S. McKinstry for violating *267 the corporate-opportunity doctrine. While he was the president, general manager, and a director of Jefferson Lumber Company, McKinstry
"conducted a competitive business of such nature as to cripple or injure the business of Jefferson Lumber Company, and ... when such a situation exists equity will impress a trust for the benefit of the corporation on the profits arising from it and on such competitive business itself to secure those profits."
258 Ala. at 698, 64 So.2d at 813. The McKinstry Court acknowledged that there was no evidence indicating that the other stockholders in the competing business, Alabama Pine Company, were aware that McKinstry was violating a fiduciary duty to Jefferson Lumber Company, but it held that this fact did not matter with regard to the imposition of the constructive trust on Alabama Pine Company's profits. "Although T.S. McKinstry's partners in Alabama Pine Company may have been ignorant of his alleged wrongful and duplicitous conduct, necessary to fasten a trust upon the property of the partnership, that would not be sufficient to defeat the trust on such property." McKinstry, 258 Ala. at 699, 64 So.2d at 814.
Moreover, this Court repeatedly has held that in corporate-opportunity cases "[t]he traditional remedy ... is a constructive trust imposed for the benefit of the corporation." Morad, 361 So.2d at 10. See also Banks, 497 So.2d at 463 (explaining that when a director " 'enter[s] into an opposition business of such a nature as to cripple or injure the corporation,' " " 'equity will impress a trust for the benefit of the corporation on the profits arising therefrom, or on the competitive business itself' " (quoting 19 C.J.S. Corporations § 785 (1940) ) ); McKinstry, 258 Ala. at 698, 64 So.2d at 813 (stating that when a director misappropriates a corporate opportunity "equity will impress a trust for the benefit of the corporation on the profits arising from it and on such competitive business itself to secure those profits" (emphasis added) ); and Lagarde, 126 Ala. at 501, 28 So. at 201 (observing that "[d]erelictions of this kind [misappropriation of corporate opportunity] are treated as a fraud on the corporation out of which equity will raise a constructive trust in its favor"). Our cases also have made it clear that a trial court has considerable discretion in fashioning such an equitable remedy. See, e.g., Coupounas v. Morad, 380 So.2d 800, 803 (Ala. 1980) (observing that "[i]t is ... clearly inherent in the very nature of equity proceedings that the trial court is authorized to mold its decree so as to adjust the equities of all parties and to meet the obvious necessities of each situation"); Sims v. Reinert, 285 Ala. 658, 661, 235 So.2d 802, 804 (1970) (stating that "a court of equity in decreeing a constructive trust is bound by no unyielding formula and ... the equity of the transaction must shape the measure of relief, thus affording a court of equity wide powers to do what it thinks right and just"). Therefore, the trial court was entitled to impose the constructive trust against AME rather than against only Mitchell personally.
Although AME and Mitchell's general arguments about the imposition of a constructive trust upon AME falter, one of their arguments regarding the specific damages award has merit. In its amended order of August 31, 2017, the trial court "clarified" that "the trust should be limited to profits from fabrication work, not total profits." As AME and Mitchell have observed, however, the trial court did not change its damages award in any way to reflect this clarification. The trial court awarded K & B $531,000, an amount based upon Blaxton's testimony that K & B made a net profit of $4,500 per community shelter, *268 and Mitchell's testimony that AME fabricated a total of 118 shelters between 2014 and 2016. The problem with this calculation is that it relies upon the amount of profit K & B allegedly would have made if it had received AME's fabrication orders from 2014 to 2016, rather than being based upon the amount of profit AME earned from fabricating shelters in that period. In other words, the trial court was correct that the trust should be limited to fabrication profits, but it did not base the damages award on AME's fabrication profits.
Our cases are clear that a constructive trust imposed in a situation such as this is supposed to capture the profits wrongfully made by the new competitive business, not the profits the plaintiff corporation would have made. See, e.g., Banks, 497 So.2d at 463 (stating that " 'if [a director] does enter into such a business, equity will impress a trust for the benefit of the corporation on the profits arising therefrom' " (quoting 19 C.J.S. Corporations § 785 (1940) (emphasis added) ) ); McKinstry, 258 Ala. at 698, 64 So.2d at 813 (stating that "when such a situation exists equity will impress a trust for the benefit of the corporation on the profits arising from it and on such competitive business itself to secure those profits" (emphasis added) ); Thigpen, Alabama Corporation Law § 10:14 (observing that, "[b]y far, the most effective remedy has been the imposition of a constructive trust, under which the appropriated business opportunity continues, though profits therefrom are placed in trust for the original corporation and all its shareholders" (emphasis added) ). One reason such a constructive trust is structured this way is that the goal is to deprive the one who breaches the fiduciary duty of the property gained through the misappropriation.[4] See American Family Care, Inc., 571 So.2d at 1058-59 (noting that, " '[w]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee' " (quoting Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919) (emphasis added) ) ); Coupounas, 380 So.2d at 803 (stating that "[a] constructive trust ... will be imposed ... where, in the absence of fraud, it would be inequitable to allow the property interest to be retained by the person who holds it" (emphasis added) ).
The trial court did not base the damages award on the amount of profit AME had earned from fabrication of the 118 community shelters. Although Mitchell testified as to the amount of total profit AME earned on each community shelter it installed ($5,000), as AME and Mitchell note, fabrication constituted only a part of that total profit because AME also finished the shelters after fabrication and then installed them. We cannot discern from the evidence introduced at trial what portion of AME's profits are attributable to fabrication or might equitably be considered as attributable to fabrication. We therefore must reverse this portion of the trial court's judgment and remand for a new hearing to arrive at a correct calculation of the damages that should be awarded.[5]
*269 B. AME's Counterclaim of Breach of the Noncompetition Agreement
AME contends that the trial court erred in concluding that K & B did not violate the noncompetition agreement. AME argues that "[a]ll evidence at trial supports liability for K & B's breach of th[e] obligations" in the noncompetition agreement. AME and Mitchell's brief, p. 48. AME states that it shared with K & B proprietary information about fabricating storm shelters, as well as its supply and distribution system, and that K & B used this information to start a competing fabrication business at Compliance.
Neither the law nor the record supports AME's assertions. The noncompetition agreement prohibited K & B from using "Proprietary Information" and "Confidential Intellectual Property Information" "to compete or assist others in competition with AME, either directly or indirectly." It also prohibited K & B from "perform[ing] the same or similar services for itself or for any competitor of AME if such services performed are in any way related to design, development, manufacture, assembly, purchase and/or sale of similar items." AME never established at trial that any of AME's "proprietary information" or "confidential intellectual property information" was transmitted from K & B to Compliance. Joel Carroll testified that when he fabricated storm shelters for Compliance he did not use any schematics from AME, and AME did not demonstrate otherwise. AME argues that, "[b]y virtue of Blaxton's stripping K & B of all assets by selling the business to Compliance without a shareholders' meeting, ... K & B and Compliance are identical entities." AME and Mitchell's brief, pp. 48-49. AME cites no authority for this contention. Moreover, K & B did not sell its entire business to Compliance. It is true that K & B sold its fabrication tools and equipment to Compliance, but the noncompetition agreement did not prohibit K & B from selling its own tools and equipment. In short, AME failed to demonstrate that Compliance's involvement in storm-shelter fabrication constituted a violation by K & B of the noncompetition agreement. We find no error in the trial court's ruling in favor of K & B on AME's counterclaim.
IV. Conclusion
The trial court's finding of liability against Mitchell and its imposition of a constructive trust upon AME are due to be affirmed. The trial court's ruling in favor of K & B on AME's counterclaim alleging breach of the noncompetition agreement is also due to be affirmed. That part of the trial court's judgment awarding damages of $531,000 must be reversed and the case remanded for further proceedings because that award is not based upon the profits earned by AME in its fabrication business.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Stuart, C.J., and Parker, Main, and Bryan, JJ., concur.

K & B appeared to abandon its claim for damages based on the appropriation of a corporate opportunity of fabricating residential shelters.

AME and Mitchell cite Western Grain Co. Cases, 264 Ala. 145, 161, 85 So.2d 395, 411 (1955), but the citation supports only the proposition that "[t]he duty imposed on the director in [personal] dealings [with the corporation] is necessarily defined by, and dependent upon, the particular facts and circumstances involved."

AME and Mitchell briefly argue that "there was no evidence that [Mitchell] controlled th[e] business decision" to have AME set up its own fabrication business. AME and Mitchell's brief, p. 21. The record belies this assertion. Dennis Weaver, AME's fabrication-facility manager, testified that Mitchell made the decision for AME to start its own fabrication facility. Mitchell testified that he made the decision to have AME stop dealing with K & B for its fabrication business. He also testified that he was "involved" in the decision for AME to start its own fabrication facility. Hinkle testified that Mitchell made the final business decisions concerning the relationship between AME and K & B. Finally, as we noted at the outset of the rendition of the facts, Mitchell is AME's chief operating officer and testified that he runs the day-to-day operations of that corporation.

Another reason is that it is generally easier to calculate the actual profits of the competitive business than to speculate concerning what the plaintiff corporation's profits would be had it received the corporate opportunity.

AME and Mitchell also complain that it was unjust for the trial court to impose the constructive trust in perpetuity. However, they cite no authority dictating that the trial court erred in this regard. In both Coupounas and Banks, this Court affirmed the imposition of an ongoing constructive trust, so precedent exists for the trial court's remedy. Moreover, it seems clear to us that this aspect of the damages award was based upon the fact that Mitchell remained a director of K & B even at the time of trial. Consequently, an ongoing breach of fiduciary duty existed. The impetus for a continuing constructive trust would end once Mitchell ceases to be a K & B director.